Gracia L. MELANSON

v.

Talbot RANTOUL et al.

Myrna B. LAMB

v.

Talbot RANTOUL et al.

Civ. A. Nos. 75–0036, 75–0008.

United States District Court,
D. Rhode Island.

Oct. 19, 1976.

Harold H. Winsten, Edward E. Dillon, Jr., Providence, R. I., for Gracia L. Melanson.

Marvin A. Brill, Providence, R. I., for Myrna B. Lamb.

Peter J. McGinn and Richard A. Sherman, Providence, R. I., for defendants Rantoul, Lay and R. I. School of Design.

Allen P. Rubine, Asst. Atty. Gen., R. I., Providence, R. I., for Governor of R. I.

Constance L. Messore, Asst. U. S. Atty., (R. I.) Providence, R. I., for the U. S.

## OPINION AND ORDER

PETTINE, Chief Judge.

These cases are presently before the court for consideration of a number of motions to dismiss.[1] Each plaintiff complains that she has suffered harm resulting from sex-based discrimination at the hands of defendants Talbot Rantoul, Donald M. Lay, Jr., and the Rhode Island School of Design (hereinafter collectively referred to as RISD). The United States of America and the Governor of Rhode Island, Philip W. Noel, have been named as additional defendants in each case under various theories outlined below.

After receiving oppositions and accompanying memoranda on those motions, the Court on April 29, 1975, ordered the plaintiffs to present further factual data and legal argument in support of their claims under 42 U.S.C. § 1983. More than sixteen months later,[2] after numerous difficulties between the parties during discovery, the Court is finally in possession of plaintiffs' factual presentation and of legal argument from all parties. This opinion is concerned only with the resolution of (1) the motion of RISD defendants to dismiss plaintiffs' claims under 42 U.S.C. §§ 1981 and 1983; (2) the motion of Governor Noel to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted; and (3) the motion of the United States of America to dismiss for lack of subject matter jurisdiction and for

---

1. The outstanding motions to dismiss are as follows:

    1) Motion to dismiss or strike of Talbot Rantoul, Donald M. Lay, Jr., and Rhode Island School of Design filed 2/11/75 in C.A. # 750008 ("Lamb") and 3/5/75 in C.A. # 750036 ("Melanson");

    2) Motion to dismiss of Philip W. Noel, filed 3/19/75 in Lamb and 3/18/75 in Melanson;

    3) Motion to dismiss of the United States of America, filed 4/9/75 in both cases.

The cases have been previously consolidated for the purpose of determining these motions under Fed.R.Civ.P. 42(a). Memorandum and Order, April 29, 1975.

The Title VII claim and Fair Labor Standards Act claims of each plaintiff against RISD are not discussed in this opinion, and remain at issue between the parties.

2. The Court is constrained to comment on the unreasonable delay of both parties in prosecuting this lawsuit. The Court's Order of April 29, 1975 envisioned completion of necessary discovery and memoranda by August 1, 1975. In fact, due to repeated arguments over the scope of discovery and repeated requests for extension of time, Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss was finally received twelve months later, in mid-August 1976. See SCM Societa Commerciale S. P. A. v. Industrial and Commercial Research Corporation, 72 F.R.D. 110 (N.D.Tex.1976).

failure to state a claim upon which relief can be granted.

### State Action

It is elementary that the fourteenth amendment is a restriction on the conduct of states, *The Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), and of actors whose conduct can fairly be attributed to a state, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). RISD denies that its actions with regard to plaintiffs can be so attributed, and has moved to dismiss plaintiffs' cause of action under 42 U.S.C. § 1983.[3]

As this Court has had frequent occasion to note, there is no clear line to decide what triggers the fourteenth amendment's prohibitions in any given case. *McClellan v. University Heights,* 338 F.Supp. 374 (D.R.I. 1972). Courts must proceed by "sifting facts and weighing circumstances", *McQueen v. Druker,* 438 F.2d 781, 783 (1st Cir. 1971), citing *Burton v. Wilmington Parking Authority, supra.* The parties are agreed that the general approach of *Burton* governs the issue of whether the "private entity was so intertwined with the state as to be subject to the standards of lawful activity imposed upon public institutions." *Berrios v. Inter American University,* 535 F.2d 1330 (1st Cir. 1976).

Plaintiffs first argue that the relationship between the state and RISD evinces "a governmental design for private execution of public functions", *Berrios v. Inter American University,* 409 F.Supp. 769 (D.P. R.1975), thereby establishing the presence of state action under the principles of *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). They seek to distinguish the holding of the Court of Appeals in *Berrios, supra,* that higher education is not a public function by pointing to "a plethora of situations and activities

where RISD *was actually performing specific functions* for and on behalf of the state" (emphasis added). These include, *inter alia,* tours of its museum for public school children, assistance in land-use planning for various towns in the state, and participation in artistic programs on behalf of the Rhode Island Department of Social and Rehabilitative Services.

With due respect, plaintiffs have completely misconstrued the public function theory, which treats as state action only the private exercise of a state-delegated power "which is traditionally associated with sovereignty". *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974); *see Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). The question is not whether RISD is performing various services for the state, but whether it has been entrusted with state power for use in traditional governmental functions, such as elections, *Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932), or the operation of municipal parks, *Evans v. Newton, supra.*

Framed this way, the Court has little trouble deciding that higher education in Rhode Island is not a public function such that its delegation to RISD transforms RISD's actions into the actions of the state. The Supreme Court has already rejected (albeit in dicta) the public function theory as applied to higher education. *Jackson, supra,* 419 U.S. at 353, 354 n. 9, 95 S.Ct.. 449; *Evans v. Newton, supra,* 382 U.S. at 300, 86 S.Ct. 486. The First Circuit seems conclusively to have rejected it in *Berrios, supra,* 535 F.2d at 1333. To the extent that the First Circuit's holding was limited to the facts before it, this Court sees no evidence before it to distinguish the factual situation in the case at bar from *Berrios, supra.*

Plaintiffs next argue that RISD's actions can fairly be attributed to Rhode Island on

---

**3.** See also *Cohen v. Illinois Institute of Technology,* 524 F.2d 818 (7th Cir. 1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); *Greenya v. George Washington University,* 167 U.S.App.D.C. 379, 512 F.2d 566 (1975), cert. denied 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975); *Blackburn v. Fisk University,* 443 F.2d 121 (6th Cir. 1971); *Browns v. Mitchell,* 409 F.2d 593 (10th Cir. 1969); *Powe v. Miles,* 407 F.2d 73 (2nd Cir. 1968); *but see Belk v. Chancellor of Washington University,* 336 F.Supp. 45 (E.D.Mo.1970); *Guillory v. Administrators of Tulane University,* 203 F.Supp. 855 (E.D.La.1962).

the basis of a network of mutual assistance and benefit. In support of their allegation that the state and local governments are "involved in the daily operations and activities of RISD" sufficient to establish "that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn", *Burton, supra,* 365 U.S. at 724, 81 S.Ct. at 861, plaintiffs have marshalled extensive evidence of the legal, financial, and programmatic relationships between RISD and Rhode Island. We proceed, as did the district court in *Berrios, supra,* by analyzing the constituent elements, later determining whether the aggregate of facts indicating governmental involvement supports jurisdiction.

### 1. State subsidization of RISD

Although RIGL § 16–35–1 authorizes the legislature to make appropriations to RISD, no such appropriations have been made at least as far back as the period covered by this lawsuit. That aid which has been received by RISD from the state has been largely indirect (i. e., tax exemptions). Direct aid has been peripheral to RISD's main function.[4] Thus, RISD has received financial support from the Rhode Island State Council for the Arts, largely for projects for the RISD Museum of Art.[5] RISD receives $15,000 yearly pursuant to a contract with the state for services provided public school children by way of museum tours. Approximately $20,000 is provided yearly by the state for student scholarships. At various times in the past twelve years, RISD has received assorted other grants from the state for various projects. RISD's total annual operating income has risen from $3 million in 1965 to over $8 million in 1974–1975.

■■■■ This picture of direct state subsidy[6] contrasts sharply with the state aid demonstrated in those few cases cited by plaintiffs where courts have found extensive subsidy, *inter alia,* sufficient for a finding of state action. In *Rackin v. University of Pennsylvania,* 386 F.Supp. 992, 997 (E.D.Pa.1974), for example, the legislature annually appropriated 25% of the university's "hard-core budget", which was defined as the University's educational and housekeeping budget.[7] Temple University's actions were attributed to Pennsylvania on a finding of, *inter alia,* state appropriation of 54% of the university's total operating

4. For example, in 1969, RISD's operating income (all sources) was $4,222,613. Of the $583,322 claimed by plaintiffs to represent state aid, $537,424 was provided in the form of tax exemptions; $15,000 for the museum contract discussed *supra*; $1000 from the City of Providence, $8,448 from the Rhode Island Council on the Arts (largely federal in source), and $21,450 for scholarship aid directly to students. The figures for other years are comparable, e. g. 1974 total income, $6,678,232; claimed state aid, $739,474, of which $662,824 was tax exemptions, and $76,650 was assorted grants to RISD's associated activities.

5. RISD received more than $50,000 from Rhode Island for its museum in 1974–1975, although it appears that much of this was federal funding funnelled through the State Council for the Arts.

6. It is well-settled that funds derived from federal sources are not relevant in determining whether there is sufficient state funding for 14th amendment prohibitions to attach. *Berrios v. Inter American University,* 535 F.2d 1330, 1332 n. 5 (1st Cir. 1976).

7. This Court agrees with the three-judge court which heard *Rackin v. University of Pennsylvania,* 386 F.Supp. 992 (E.D.Pa.1974) that it is the institution's educational and house-keeping budget, and not the sum of all separately funded activities, which must be substantially supported by the state before the institution's educational activities can be termed "state actions". As the *Rackin* court defined it,

"The 'hard-core' or unrestricted budget is a method of presenting those activities whose net financial result directly affects the University's operating deficit. Its funds can be utilized for any purpose and any deficit incurred is to be covered by the University Operating Fund. This 'hard-core' budget is essentially the University's educational and house-keeping budget. From it comes two-thirds of all expenditures for instruction and departmental research; half the student aid funds; and nearly all expenditures for library operating expenses and operation and maintenance of the University's physical plant. The solvency of the University depends upon balancing this budget." 386 F.Supp. at 997 n. 5.

income. *Isaacs v. Board of Trustees of Temple University,* 385 F.Supp. 473 (E.D. Pa.1974). Similarly, in *King v. Conservatorio de Musica de Puerto Rico,* 378 F.Supp. 746 (D.P.R.1974), the defendant university was almost entirely subsidized by annual legislative appropriations. *See also Ryan v. Hofstra University,* 67 Misc.2d 651, 324 N.Y.S.2d 964 (Sup.Ct.1971) (state action based on state ownership and lease-back of one-half book value of university's assets). In short, using figures which can be compared (direct operating expenses), state aid to RISD is far less than appears in other cases where plaintiffs have prevailed. Rhode Island's direct aid to RISD has not, at least as far back as 1965, totalled more than 2% of RISD's operating income.

Plaintiffs urge the court to include tax exemptions received by RISD in calculating the total state aid it receives. The *Rackin* court, for instance, seems to have considered tax exemptions in its examination of the broad picture of state subsidization, although the extent on which it so relied is not at all clear. (The 25% direct appropriation, of course, excluded tax exemption. *Rackin, supra,* at 996–97, 1000.) Courts and commentators are in disagreement over this question. *Compare Griffin v. County School Board of Prince Edward County,* 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964) (enjoining the grant of tax exemptions to racially discriminating schools) *with Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 699 (1970) (upholding tax exemptions applicable to religious, as well as other, organizations.) *See* H. Friendly, The Dartmouth College Case and the Public-Private Penumbra 19 n. 66 (tax exemption is not, state aid for either First Amendment or Fourteenth Amendment purposes.)

This Court is inclined to discount such exemptions in the context of the inquiry undertaken here, since weighing such exemptions would tend to convert libraries, art galleries, and charitable foundations into arms of the state. *See Walz v. Tax Commission, supra,* 397 U.S. at 675, 90 S.Ct. 1409. Indeed, by tradition higher private

educational institutions in all the states are tax-exempt, and counting such exemptions (especially where the institution is located on valuable property) would be precisely the labelling contributing to the erosion of the autonomy and diversity of private education against which the First Circuit has warned. *Berrios v. Inter American University, supra,* 535 F.2d at 1333. However, this Court has looked at the extent of state subsidization both including and disregarding the tax exemptions afforded RISD, and finds the level of subsidy under either computation far below that found in *Rackin, Isaacs, King,* and *Ryan, supra.* Certainly RISD is enriched by the state aid it receives; but it does not appear to the Court that it is dependent on this aid to perform its educational function in the way that the University of Pennsylvania, Temple, or Hofstra were in the cases cited by plaintiffs.

## 2. State control and regulation of RISD

■ The Court must next examine the extent of governmental control and regulation of RISD. Subsidization, without more, does not constitute state action, *McQueen v. Druker, supra,* and the "more" has usually taken the form of extensive governmental participation in and regulation of the affairs of the private institution. *Berrios v. Inter American University, supra,* 409 F.Supp. at 771. Here, the Court finds Rhode Island's control and regulation of RISD is minimal.

Section 16–35–3 R.I.G.L. reserves a seat on the Board of Trustees for the Commissioner of Education, and RISD's by-laws require the election to the Board of Trustees of the Governor, the Mayor of Providence, and the Librarian of the Providence Public Library, all to serve *ex officio.* This hardly manifests the pervasive state control envisioned in *Rackin v. University of Pennsylvania, supra* (13 public officials on 25 member Board of Trustees), or *Isaacs v. Board of Trustees of Temple University, supra* (state appointment of one-third of Board of Trustees). Nor does a provision which allows the state to inspect RISD at

its pleasure,[8] or which requires RISD to submit an annual report to the Commissioner of Education,[9] constitute the involvement contemplated by the First Circuit in *Berrios, supra.* Nothing before the Court indicates that RISD has paid over its independence of action to the state in return for the aid it receives.

### 3. State entanglement with RISD

Although neither state subsidy nor state control separately suffice to establish the requisite interdependence for attributing RISD's actions to Rhode Island, the Court must still examine the relationship of RISD to Rhode Island to determine whether they are so intertwined and entangled that RISD's actions, fairly considered, are those of the state. *Burton v. Wilmington Parking Authority, supra.* Plaintiffs note that in *Burton* the Supreme Court found state action even though it found (1) no state subsidization of the restaurant which was leasing state property, and (2) that the state had not directly fostered or encouraged the private acts of discrimination. *Burton* held, and this Court agrees, that a symbiotic relationship, without showing the state's direct active involvement in the discrimination, may make the state a joint participant sufficient to bring wrongful acts of discrimination within the Fourteenth Amendment's prohibitions. *See Rackin v. University of Pennsylvania, supra,* at 1003.

Plaintiffs contend that the interdependence necessary to establish state action in a case of sex discrimination is less substantial than that necessary to establish state action in a due process case. They seek to distinguish *Berrios v. Inter American University, supra,* on this ground, and rely on a line of authority in the Second Circuit.

*See, e. g., Weise v. Syracuse University,* 522 F.2d 397 (2d Cir. 1975); *Grafton v. Brooklyn Law School,* 478 F.2d 1137 (2d Cir. 1973); *Powe v. Miles,* 407 F.2d 73 (2d Cir. 1968).

Although the Second Circuit agrees with the First Circuit that subsidization and regulation unrelated to the challenged activity to not transform a university's disciplinary activities into state action, *Powe v. Miles, supra,* 407 F.2d at 81, it has adopted a lesser state action standard for a university's acts of racial discrimination, *Powe v. Miles, supra,* at 82, (2d Cir. 1974), and apparently a standard somewhere in between for sex-based discrimination. *Weise v. Syracuse University, supra,* 522 F.2d at 406. The *Weise* court presented a two-fold rationale for this distinction: (1) "the peculiar offensiveness of the state's taxing all citizens for objectives from the benefits of which a particular category is arbitrarily excluded or disadvantaged"; and (2) the superior competence of the judiciary in handling discrimination claims, as opposed to disciplinary due process claims, without meddling in the university's affairs. 522 F.2d at 405–06.

Defendants counter that the Second Circuit's test, unrecognized thus far in this Circuit, is illogical. They point out that students in due process disciplinary cases face the same harm—exclusion from the university—which teachers in discrimination cases face.

This Court finds it unnecessary to decide whether sex discrimination cases require a less stringent standard for finding state action than do disciplinary due process cases.[10] Even under the lesser standard suggested by *Weise v. Syracuse University, supra,* plaintiffs have not succeeded in establishing the necessary symbiotic relation-

---

**8.** R.I.G.L. § 16–35–1 provides:

Such sums as shall be from time to time appropriated by the general assembly to the Rhode Island School of Design, shall be paid by the general treasurer upon the orders of the department of education, which is hereby empowered and authorized to visit and examine said school at its pleasure.

**9.** R.I.G.L. § 16–35–2.

**10.** Without deciding the issue, the Court notes that it would find it difficult to follow reasoning which finds greater constitutional warrant, or greater judicial competence, for ensuring equal protection rights than First Amendment or due process rights. *See Wiese v. Syracuse University,* 522 F.2d 397, 406 (2nd Cir. 1975).

ship between RISD and Rhode Island. Not only is any degree of direct state involvement in the alleged discrimination lacking here, *Berrios, supra,* 409 F.Supp. at 771; there is also lacking the interdependence envisioned in *Burton v. Wilmington Parking Authority, supra,* or shown in *Fortin v. Darlington Little League,* 514 F.2d 344 (1st Cir. 1975) (state action where municipal government constructed baseball diamonds to league specifications and reserved to league exclusive use at peak hours). Plaintiffs point to the contractual relationship under which RISD supplies museum tours to state school children as evidence of the necessary interdependence, but the Court finds such contract simply not analogous to the decision by the state in *Burton, supra,* to rent state property to a restaurant owner who discriminated on those premises. There are no mutual financial benefits based on the discrimination in the case at bar such as those the Court relied on in *Burton, supra,* 365 U.S. at 861, 81 S.Ct. 856.

Nor does the Court find that the joint participation of RISD and Rhode Island in various fund-raising activities establishes sufficient entanglement to constitute state action. Plaintiffs cite *Rackin v. University of Pennsylvania, supra,* where the court relied, *inter alia,* on joint lobbying efforts of the University and state officials in seeking funds from the state legislature and federal government. Plaintiffs have submitted evidence showing cooperation between RISD and the Rhode Island State Council for the Arts in seeking federal and state funding for various projects.[11] This Court does not believe that such cooperation adds anything of significance to the evidence already considered and found lacking. Indeed, the *Rackin* court seems to have considered lobbying only insofar as it was evidence of the university's dependence on state appropriations for its survival as "an educational

institution of national prominence". 386 F.Supp. at 1004. Therefore, considering the extent of subsidization, regulation, and cooperation in this case, separately and together, in light of the First Circuit's decision in *Berrios v. Inter American University, supra,* this Court concludes that plaintiffs have failed to show that Rhode Island has so far insinuated itself into a position of interdependence with RISD as to make it a joint participant in RISD's alleged discrimination. Defendant RISD's motions to dismiss the causes of action under 42 U.S.C. § 1983 are granted.

*Plaintiffs' § 1981 claims against RISD*

■ Plaintiffs have also sought jurisdiction under 42 U.S.C. § 1981 and 28 U.S.C. § 1343(3). Section 1981 provides, in relevant part: "All persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." Almost all courts which have considered the question have agreed that § 1981 provides relief solely for racial discrimination. *Clark v. Morgan's Austintown Foods, Inc.,* 405 F.Supp. 1008 (D.Ohio 1976); *Jackson v. University of Pittsburgh,* 405 F.Supp. 607 (W.D.Pa.1975); *Rackin v. University of Pennsylvania, supra; League of Academic Women v. Regents of the University of California,* 343 F.Supp. 636 (N.D.Cal.1972); *Williams v. San Francisco Unified School District,* 340 F.Supp. 438 (N.D.Cal.1972); *contra, Johnson v. City of Cincinnati,* 450 F.2d 796 (6th Cir. 1971). This Court agrees with this extensive line of authority, and accepts the analysis of Judge Renfrew in *League of Academic Women v. Regents of University of California, supra:*

> "Section 1981 was enacted to protect the rights of two groups of people—nonwhites and non-citizens who were not afforded equal treatment to white citizens.

---

11. For example, plaintiffs rely on a letter from Joel S. Silverberg, of the Rhode Island State Council on the Arts, to Stephen Ostrow of RISD, dated November 30, 1973, in which Mr. Silverberg requests information from RISD relative to the services and activities RISD offers to students, schools, elderly citizens, and simi-

lar groups in Rhode Island for use in the Council's lobbying efforts to secure state funds for the support of the arts and education. They also note a letter from Miriam Kapsinow, also of the State Council on the Arts, informing RISD that she has located federal funds for a particular RISD project.

The standard against which the rights of these [people] must be measured is the rights of *white citizens.* The change in language to include 'all people' was designed to include non-citizens and persons not born in the United States within the coverage of the Act. The amendment was not so broad as to extend coverage to all rights of all people. The 'all persons' language of the statute speaks only to the issue of to which persons the Act applies. It does not purport to delineate the rights accorded those individuals. The standard against which the rights of the protected individuals must be matched remains the rights of white citizens.

. . . [T]here is noting in the history of the Act to suggest that Congress envisioned any sexual differences when it established the white citizen standard."

*See also McDonald v. Sante Fe Trail Transporation Co.,* —— U.S. ——, ——, ——, 96 S.Ct. 2574, 2580, 2583, 49 L.Ed.2d 493 (1976).

For these reasons, the Court grants defendant RISD's motions to dismiss the causes of action under 42 U.S.C. § 1981.

### Claims Against the United States

The United States has been made a defendant to each of the actions at bar, although it is nowhere alleged that the United States has in any way participated in the alleged discrimination. Plaintiffs contend that RISD is discriminating in part with funds supplied by the Federal government, and seeks relief in the form of an injunction prohibiting further federal funding of RISD. Jurisdiction is invoked under 28 U.S.C. § 1343(3) and 29 U.S.C. § 206(d) for causes of action arising under section 706 of the Civil Rights Act of 1964 (42 U.S.C. § 2000e–5), and 42 U.S.C. §§ 1981, 1983. No claim is made against the United States grounded on the equal protection clause of the Fifth Amendment.

■ No cause of action arises against the Federal government under 42 U.S.C. § 1983. *District of Columbia v. Carter,* 409 U.S. 418, 424, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

Nor is the United States a "person" for purposes of § 1983. *Savage v. United States* 322 F.Supp. 33 (D.Minn.), *aff'd.* 450 F.2d 449 (8 Cir. 1971), *cert. denied* 405 U.S. 1043, 92 S.Ct. 1327, 31 L.Ed.2d 585 (1972). Similarly, § 1343(3), the jurisdictional companion to § 1983, does not apply to actions of the Federal government. *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 398 n. 1, 91 S.Ct. 1999, 29 L.Ed.2d 619 (Harlan, J., concurring in the judgment).

Section 1981, for reasons discussed above, does not apply to sex discrimination. Therefore, even if § 1981 provided a cause of action against the United States, *but see Brown v. General Services Administration,* 425 U.S. 820, 821–829, 96 S.Ct. 1961, 1963–66, 48 L.Ed.2d 402 (1976), not barred by sovereign immunity, it would be inapplicable to this case.

■ Plaintiffs' attempt to sue the United States under 42 U.S.C. § 2000e–5 borders on the frivolous, and can be summarily dismissed. Section 2000e–5 expressly provides that the United States is not deemed an employer for purposes of that section. The Civil Rights Act of 1964 has been amended to provide a cause of action for employment discrimination by the Federal Government, 42 U.S.C. § 2000e–16, but plaintiffs here are not employed by the Federal government. Nor have the jurisdictional prerequisites of either § 2000e–5 or § 2000e–16 been met as to the Federal government, since the United States was not named as a respondent in plaintiffs' proceedings before the EEOC. 42 U.S.C. § 2000e–5(f)(1); 42 U.S.C. § 2000e–16(c).

Finally, 29 U.S.C. § 206(d) is not jurisdictional. The jurisdictional companion for 29 U.S.C. § 206(d), 29 U.S.C. § 216, confers jurisdiction only against employers, and plaintiffs have admitted that the United States is in no way the employer of either plaintiff.

■ Despite the complete lack of merit to any of plaintiffs' theories seeking jurisdiction over the United States, they contend that the United States is a proper party

defendant because relief against it would be effective. They rely on a number of cases, of which the following is representative:

> "The Court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965).

However, courts are not free to add defendants merely because they can provide relief to plaintiffs for wrongs they have not committed, and of which the law holds them harmless. Federal district courts are courts of limited jurisdiction, *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 673, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). No statute cited by defendants, and none found by the Court, provides jurisdiction over the United States under the facts alleged here. Motions to Dismiss of defendant United States of America are granted.

### Claims Against the Governor of Rhode Island

■ Plaintiffs have sought jurisdiction over Governor Noel under each of the theories which were invoked for the United States. Jurisdiction as to the Governor is lacking under 42 U.S.C. § 1981, 29 U.S.C. § 206(d), and 42 U.S.C. § 2000e–5, for the reasons discussed above, and defendant Noel's motions to dismiss are granted as to these causes of action.

The plaintiffs' claims under 42 U.S.C. § 1983 diverge somewhat at this point, and the Court will consider them separately.

■ Plaintiff Melanson agrees "that the Governor has not engaged in any discriminatory practices", but contends that dismissal of the action is precluded by the holding in *Roberts v. Acres*, 495 F.2d 57 (7th Cir. 1974). Noting that complaints un-

der the civil rights acts are to be liberally construed, the *Roberts* Court said that the

> " 'only elements which need to be present in order to establish a claim . . . are that the conduct complained of was engaged under color of state law, and that such conduct subjected the plaintiff to the deprivation of rights, privileges, or immunities secured by the Constitution of the United States.' *Marshall v. Sawyer*, 301 F.2d 639, 646 (9th Cir. 1962)." 495 F.2d at 59.

However, the *Roberts* Court assuredly did not mean to provide a cause of action against non-culpable third parties as long as the necessary elements of a valid cause of action are stated. It must be alleged that the wrongful conduct was conduct of the defendant. *Rizzo v. Goode*, 423 U.S. 362, 377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Here the plaintiff agrees that the discriminatory acts were not those of the defendant, but seeks relief against the Governor because she thinks he can in some way put pressure on RISD. In the absence of allegations that the Governor either fostered or took part in the alleged discrimination, or that he violated an affirmative duty to plaintiff to remedy RISD's alleged discrimination against plaintiff, the Governor's Motion to Dismiss must be and hereby is, granted. *Mann v. Davis*, 213 F.Supp. 577, 579 (E.D.Va.1962), aff'd 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964).

■ Plaintiff Lamb stands in a somewhat different position, and advances a more substantial theory on behalf of her attempt to forestall defendant Noel's motion to dismiss. She contends that the necessary nexus between the harm she complains of and defendant Noel's actions is supplied by his failure to implement the recommendations of the Rhode Island Commission for Human Rights (hereinafter the Commission) resulting from a complaint she filed with the Commission.[12] It is necessary

---

12. Since plaintiff Melanson never filed a complaint with the Rhode Island Commission for Human Rights, no findings regarding her alleged discrimination, or recommendations resulting from such findings ever reached the Governor. The Court expresses no opinion here as to whether such filing with the Commission was a jurisdictional prerequisite for Melanson's Title VII claim.

to examine this argument, and the facts behind it, in some detail.

Pursuant to section 706 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5, plaintiff Lamb filed a complaint on November 27, 1972 with the Rhode Island Commission for Human Rights created by Executive Order No. 32, August 25, 1972, by Governor Frank Licht.[13] The Commission's understanding of its authority, not disputed by plaintiff Lamb, limited it to recommending administrative action which it determined the Governor should take; it was possessed of no power to order affirmative relief for any complainant itself, nor was the Governor obligated by his own executive order to follow the Commission's recommendations. Executive Order No. 32, *supra.*

On September 16, 1974, the Commission issued its *Findings of Fact, Conclusions of Law, and Order*, finding that RISD had discriminated against Lamb in particular, and women in general. The Commission recommended to Governor Noel that he withhold all state funds from RISD, in accordance with the (discretionary) provisions of the Executive Order. The evidence before the Court indicates that the Governor took no action on that recommendation, and has never indicated his reasons for such inaction.

Section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."

Plaintiff's argument seems to be as follows: whether or not the state's subsidization of RISD is sufficient to attribute RISD's actions to the state, the Governor himself is causing plaintiff to be subjected to the deprivation of her 14th Amendment right to be free from discrimination by allowing state funds to be distributed to an institution which he had reason to know was engaging in discrimination on the basis of sex. Plaintiff does not rely on a general duty of state officials to insure that public funds are not used for discriminatory purposes, but rather on the Governor's alleged duty either to act on the recommendation and findings of the Commission, or to investigate further, satisfying himself that state funds were not being used for discriminatory purposes before he further released them.

The Court finds some authority for this theory. Judge Friendly, a leading scholar of the state action problem, finds a clear distinction between suits against institutions, where the claim rests on receipt of state funds, and suits against the state itself:

"A holding that an otherwise private institution has become an arm of the state is much broader and can have far more serious consequences than a determination that the state has impermissibly fostered private discrimination." *Jackson v. Statler Foundation* 496 F.2d 623, 637 (2nd Cir. 1974) (Friendly, J., dissenting from denial of reconsideration en banc.)

This distinction conforms to the warning by the First Circuit against use of state action analysis as an excuse for undue interference by the judiciary into the affairs of private higher educational institutions. *Berrios v. Inter American University, supra*, 535 F.2d at 1333. Relief, if warranted, would operate solely against the state. *Compare Norwood v. Harrison*, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973), where the Court held that the Constitution prevents the state from providing free textbooks to students in discriminatory private schools, although it accepted as unchallenged the right of private schools to practice discrimination.[14]

---

**13.** Executive Order No. 32 was superseded by Governor Noel's Executive Order No. 14, January 22, 1974. The two Orders are the same in relevant parts.

**14.** The Court has since ruled that 42 U.S.C. § 1981 forbids discrimination in private schools. *McCrary v. Runyon*, —— U.S. ——, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).

Even under this theory, however, plaintiff must show that the challenged action (here, provision of state funds to RISD) sufficiently promoted private discrimination to render the decision impermissible for a government officer. *Jackson v. Statler Foundation, supra,* at 637 (Friendly, J., dissenting from denial of reconsideration en banc); *Norwood v. Harrison, supra,* 413 U.S. at 466, 93 S.Ct. 2804. This is but another way of stating the Article III requirement that a federal court can act "only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party." *Simon v. Eastern Kentucky Welfare Rights Organization (E.K.W.R.O.),* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). The question before the Court is therefore, whether Governor Noel's action promoted the discrimination alleged here.

In *Simon v. E.K.W.R.O., supra,* plaintiffs complained of harm resulting from the denial by certain hospitals of free medical treatment, which they alleged had been guaranteed by an IRS revenue ruling defining conditions under which hospitals were entitled to receive tax-exempt charitable contributions. They claimed that a revised revenue ruling had caused these hospitals to alter their policies regarding free medical care for the poor. The Court held that plaintiffs' suit should have been dismissed for lack of standing, since it was

> "purely speculative whether the denials of service specified in the complaint fairly can be traced to [the IRS'] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications. It [was] equally speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to respondents of such services. So far as the complaint sheds light, it is just as plausible that the hospitals to which respondents may apply for service would elect to forego favorable tax treatment to avoid the undetermined financial drain of

an increase in the level of uncompensated services."

at 42–43, 96 S.Ct. at 1926.

Similarly, this Court is of the opinion that plaintiffs' facts and figures have failed to demonstrate the necessary financial dependence of RISD on state funds which the Governor could have withdrawn which would warrant an inference that the discrimination was the consequence of the Governor's actions. It is a matter of pure conjecture whether prospective relief would remove the harm. *Cf. Simon v. E.K.W.R.O., supra,* at 43–45, 96 S.Ct. at 1927. In such a circumstance plaintiffs lack the requisite standing to sue.

The Court does not believe that such a showing would be impossible to make in another case. For instance, the necessary connection could be supplied by evidence that a plaintiff's particular job position was substantially funded with state funds. Here, however, the plaintiff has failed to show, as the cases require, that state aid had a "significant tendency to facilitate, reinforce, and support private discrimination". *Norwood v. Harrison, supra,* 413 U.S. at 466, 93 S.Ct. at 2811.

Motions of Governor Noel to dismiss as to both plaintiffs are granted.

### Motions to Strike

■■■ Finally, the Court has before it defendant RISD's motions to strike sections of each complaint. RISD contends that all allegations regarding its activities in connection with plaintiffs before March 24, 1972 should be stricken as legally irrelevant, immaterial, and prejudicial. They note that RISD, as well as other institutions of higher education, was exempt from the provisions of Title VII until March of 1972. Because plaintiffs' claims for back pay under the Fair Labor Standards Act may be tried to a jury, defendants find it a "necessary conclusion" that their rights will be prejudiced by the inclusion of allegations in the Complaint of acts of sex discrimination occurring prior to March 24, 1972. In particular, they object to the inclusion of the *Findings of Fact, Conclusions of Law, and*

*Order* issued by the Rhode Island Commission for Human Rights in response to plaintiff Lamb's pursuit of her administrative remedies. The Commission found, in that report, that RISD had a history of sex discrimination in its faculty hiring, and that plaintiff Lamb had herself been the victim of RISD's discrimination. The Commission, as all parties agree, was powerless to effect any remedy for such discrimination, and was limited to advising the Governor.

Keeping in mind the rule that motions to strike are not favored, *Cohen v. City of Miami*, 54 F.R.D. 274 (S.D.Fla.1972), this Court finds defendants' contentions meritless. It is well-settled that "pre-Act discriminatory conduct [is] relevant to the extent that it sets in motion a chain of consequences which affects the status of the [female] employee in the post-Act period." *Burns v. Thiokol Chemical Corporation*, 483 F.2d 300 (5th Cir. 1973). *See also id.* at 306; *United States v. Jacksonville Terminal Co.*, 451 F.2d 418 (5th Cir. 1971); *Georgia Power Co. v. EEOC*, 412 F.2d 462, 468 (5th Cir. 1969). Therefore, the Court cannot accept defendant's suggestion at this point that such material is immaterial. Should it appear at trial that material sought to be admitted is immaterial, inadmissable portions can be excluded at that point. The Court would, of course, carefully instruct the jury as to the weight to be given the pleadings.

Similarly, the Court cannot find allegations regarding plaintiff Lamb's administrative proceeding immaterial. Indeed, were such allegations stricken, defendants would more than likely file a motion to dismiss on failure-to-exhaust grounds. *Moreman v. Georgia Power Co.*, 310 F.Supp. 327 (D.Ga.1969); *Latino v. Rainbow Bakers, Inc.*, 358 F.Supp. 870 (D.Colo.1973).

The motions to strike are denied.