**Alice BOBO, Plaintiff-Appellant,**

**v.**

**ITT, CONTINENTAL BAKING COMPANY, Defendant-Appellee.**

**No. 80-1671.**

United States Court of Appeals, Fifth Circuit.

Nov. 25, 1981.

Richard M. Schechter, Houston, Tex. (Court-appointed), for plaintiff-appellant.

Coke & Coke, Thomas W. Craddock, Dallas, Tex., for defendant-appellee.

Before AINSWORTH, INGRAHAM and TATE, Circuit Judges.

AINSWORTH, Circuit Judge:

The principal issue raised by this appeal is whether 42 U.S.C. § 1981, derived primarily from the Civil Rights Act of 1866, 14 Stat. 27,[1] encompasses claims of sex discrimination. The clear answer is that it does not.

Alice Bobo, a black woman, brought this action against her former employer ITT, Continental Baking Company (ITT). She alleged that ITT discharged her because she had refused to wear a hat that co-employees allegedly were not required to wear. She also averred that prior to her firing, she had been the victim of other discriminatory employment conditions because of her race and sex. Bobo sought relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981. Upon motion by ITT, partial summary judgment was entered against Bobo by the district court. The court ruled that Bobo's Title VII claim was barred because of her failure to sue within 90 days of receipt of her right to sue letter from the Equal Employment Opportunity Commission. 42 U.S.C. § 2000e–5(f). The court also held that since § 1981 did not reach claims of sex discrimination, Bobo was entitled to a trial only on the issue of whether she had been subjected to racial discrimination.

At trial the court, sitting without a jury, heard accounts of Bobo's tumultuous employment history with ITT. Bobo was originally hired as a bread sales representative, requiring that she drive a company truck to retail outlets to sell and stock ITT's baked goods. While serving in this capacity, she was reprimanded by her superiors for unauthorized absence from work and for failure to remove stale products from store shelves. She also was compelled to reimburse ITT for shortages in the proceeds she collected from bread sales. After ninety days as a sales representative, Bobo requested a transfer to a job inside ITT's plant. She testified that her request was prompted by racially discriminatory remarks made by supervisory personnel. The district court chose not to credit this testimony, since it contradicted a deposition she had given three years earlier disclaiming the notion that her supervisors' attitudes toward her were influenced by a racial animus. Although Bobo also claimed that fellow em-

1. Title 42 U.S.C. § 1981 provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

This section was adapted chiefly from § 1 of the Civil Rights Act of 1866, 14 Stat. 27. Similar language is found in § 16 of the Enforcement Act of 1870, 16 Stat. 144. Section 18 of the 1870 Act also reenacted the 1866 Act. The present version is the product of the 1874 codification of federal statutory law. *Runyon v. McCrary*, 427 U.S. 160, 168 n. 8, 96 S.Ct. 2586, 2593 n. 8, 49 L.Ed.2d 415 (1976).

ployees harassed her with pranks, the court found that ITT had neither known of nor condoned such employee conduct. The court also observed that the evidence suggested that even Bobo believed the pranks were directed at her sex, not her race.

Bobo's request was honored and she was transferred to a position as a sanitation worker inside ITT's plant. Here she was reprimanded for tardiness, interference with a fellow employee's work, and use of a work area during break time. Ultimately, when she refused to wear a hard-shelled safety hat to protect her from objects that might fall from overhead conveyor belts, she was discharged for insubordination. Although she contended that other employees were not compelled to wear the safety hats, she admitted that some of these employees were black. The court in addition found that only employees who worked in areas with a risk of falling objects were forced to wear safety hats. The court found that ITT's policy was to dismiss insubordinate employees and that this policy was evenly applied. Concluding that Bobo's unacceptable behavior, not ITT's racial discrimination led to her dismissal, the court entered judgment for ITT.

On appeal, Bobo attacks the district court's findings of fact as well as its determination that sex discrimination is not cognizable under § 1981.[2]

*Sex Discrimination Under § 1981*

Section 1981 generally forbids racial discrimination in the making and enforcement of private contracts, including private employment contracts, whether the aggrieved party is black or white. *Runyon v. McCrary,* 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976); *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295, 96 S.Ct. 2574, 2586, 49 L.Ed.2d 493 (1976); *Johnson v. Railway Express Agency*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975). The statute also reaches claims of racial discrimination in admission to private institutions, at least where such institutions purport to be open to the public. *Runyon v. McCrary, supra,* 427 U.S. at 172–73, 96 S.Ct. at 2595–96; *Tillman v. Wheaton-Haven Recreation Assn.*, 410 U.S. 431, 440–41, 93 S.Ct. 1090, 1095, 35 L.Ed.2d 403 (1973).

Although § 1981 strikes at many forms of racial discrimination, no court has held that allegations of gender based discrimination fall within its purview. Courts at every level of the federal judiciary have considered the question and reached the opposite result. The Supreme Court, in framing the question for decision in *Runyon,* explained that the case did not involve "the right of a private school to limit its student body to boys, to girls, or to adherents of a particular religious faith, since 42 U.S.C. § 1981 is in no way addressed to such categories of selectivity." *Id.* 427 U.S. at 167, 96 S.Ct. at 2593. Even if we were to heed Bobo's invitation to regard this statement as dictum and therefore not dispositive of the issue, we could not ignore the Supreme Court's consistent emphasis on the racial character of § 1981, as indicated by the law's language and legislative history. The Court has interpreted the phrase "as is enjoyed by white citizens . . ." in § 1981 as reflecting its drafters' intention that the statute ban racial discrimination.

The Court's view of the 1866 Act's purpose was expressed in *Georgia v. Rachel,* 384 U.S. 780, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966), which construed its removal provisions.[3] In examining the legislative history, the Court noted that the "white citizens" language was not a part of the original Senate bill, but was added later "apparently to emphasize the racial character of the rights being protected." *Id.* at 791, 86 S.Ct. at 1789. The Court considered the legislative history of the 1866 Act and concluded

2. Bobo filed a pro se brief assailing the district court's findings of fact. Appointed counsel filed a supplemental brief on the § 1981 issue. The dismissal of Bobo's Title VII action was not appealed.

3. The 1866 Act's removal provisions are now codified at 28 U.S.C. § 1443.

that it "clearly indicates that Congress intended to protect a limited category of rights, specifically defined in terms of racial equality." *Id.* Two terms later, while determining the breadth of 42 U.S.C. § 1982[4] in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), the Court repeatedly referred to the 1866 Act's aim of eliminating racial discrimination. The Court observed that unlike the Fair Housing Title (Title VIII) of the Civil Rights Act of 1968, § 1982 was addressed only to racial discrimination. *Id.* at 413, 88 S.Ct. at 2189. Finally, in perhaps its most extensive discussion of the legislative history of the 1866 Act, the Court reaffirmed the limits on § 1981 in *McDonald.* Though extending the statute's protection to claims of racial discrimination by whites, the Court ruled that the 1866 Act's goal was to promote equality among the races by precluding discrimination in the making and enforcement of contracts either for or against any particular race. *McDonald v. Santa Fe Trail Transportation Co., supra*, 427 U.S. at 295, 96 S.Ct. at 2586.

Bobo nevertheless argues that the term "white citizens" should be deemed synonymous with "most favored group," thereby permitting those who find themselves somehow less favored to advance discrimination charges under § 1981. A sweeping interpretation of this sort, however, would thwart the statute's evident meaning and purpose. As the Supreme Court has explained, Congress enacted § 1 of the 1866 Act with the ambitious goal of ensuring equal citizenship for the newly freed slaves. Statements in the legislative history, carefully reviewed in *McDonald*, reflect this objective and confirm that the "white citizens" language was added specifically to preclude a construction that might expand the statute's coverage to other groups. Representative Wilson, who proposed amending the original bill to add the "white citizens" language, stated that "the reason for offering [the amendment] was this: it was thought by some persons that unless these qualifying words were incorporated in the bill, those rights might be extended to all citizens, whether male or female, majors or minors." Cong. Globe, 39th Congress., 1st Sess., App. 157. (1866). A supporter of the bill, Representative Shallabarger, expressed the sentiments of his colleagues when he remarked that "[i]ts whole effect is to require that whatever rights ... the States may confer upon one race or color of the citizens shall be held by all races in equality. Your State may deprive women of the right to sue or contract or testify, and children from doing the same. But if you do so, or do not so as to one race, you shall treat the other likewise ...." *Id.* at 1293.

Bobo further contends that since women obviously lacked equal legal rights during the Reconstruction era, "white citizens" should be read as "white men." But as the legislative history quoted above indicates, Congress meant precisely what it said. The drafters of § 1981 had no intention to disturb public or private authority to discriminate against women.[5] Outlawing such discrimination in the United States in 1866 would have signaled an extraordinary social transformation, a result clearly not desired by Congress. Public sensitivity to the ills of gender discrimination is of more recent origin. *See, e. g.*, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; Equal Pay

4. Section 1982 proscribes discrimination with respect to real or personal property interests. *See City of Memphis v. Greene*, 451 U.S. 100, 101 S.Ct. 1584, 1596–98, 67 L.Ed.2d 769 (1981). Like § 1981, § 1982 is principally derived from § 1 of the Civil Rights Act of 1866.

5. In *Frontiero v. Richardson*, 411 U.S. 677, 684–85, 93 S.Ct. 1764, 1769, 36 L.Ed.2d 583, a plurality of the Supreme Court recalled the status of women in the 19th century:

> [T]hroughout much of the 19th century the position of women in our society was, in many respects, comparable to that of blacks under the pre-Civil War slave codes. Neither slaves nor women could hold office, serve on juries, or bring suit in their own names, and married women traditionally were denied the legal capacity to hold or convey property or to serve as legal guardians of their own children.

Act of 1963, 29 U.S.C. § 206(d). We cannot ascribe contemporary attitudes to a Congress acting over a century ago when its views to the contrary are so plainly stated.

The question before us has been frequently considered by courts, but never resolved in the manner sought by Bobo herein. A panel of this court in *Willingham v. Macon Telegraph Publishing Co.*, 482 F.2d 535, 537 n. 1 (5th Cir. 1973) ruled that sex discrimination was not cognizable under § 1981. The panel opinion was vacated en banc, however, a majority of the court viewing the case as not involving sex discrimination, but discrimination based upon grooming standards. Thus, there is no direct holding by this court that gender based discrimination is not within the acts forbidden by § 1981. At least two other circuits, however, have so held. *Movement for Opportunity and Equality v. General Motors Corp.*, 622 F.2d 1235, 1278 (7th Cir. 1980) (adopting district court opinion); *DeGraffenreid v. General Motors Assembly Div., St. Louis*, 558 F.2d 480, 486 n. 2 (8th Cir. 1977). A procession of district court opinions is in agreement with this view.[6] In cases not presenting sex discrimination complaints, this court also has stated that § 1981 applies only to race. *Olivares v. Martin*, 555 F.2d 1192, 1196 (5th Cir. 1977); *Campbell v. Gadsden County District School Board*, 534 F.2d 650, 653–54 n. 8 (5th Cir. 1976).[7]

Bobo cites *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641 (5th Cir. 1974) in support of a broader reading of § 1981. In *Guerra* a Mexican citizen lawfully residing in the United States complained that he was the victim of discrimination as a result of a collective bargaining agreement which targeted American citizens for more desirable jobs. The court held that § 1981 reached charges of discrimination based on alienage by private employers. In light of *Runyon* and *McDonald*, discussed above, we have previously characterized *Guerra* as a broad construction of § 1981 in a case with "strong racial overtones." *Campbell v. Gadsden County District School Board, supra*, 534 F.2d at 653–54 n. 8. Whatever vitality it may retain, *Guerra* did not propose extending § 1981 to sex discrimination, and thus lends no support to Bobo's contentions.

6. *Paskuly v. Marshall Field & Co.*, 494 F.Supp. 687, 690 (N.D.Ill.1980); *Grimes v. Pitney Bowes, Inc.*, 480 F.Supp. 1381, 1386 (N.D.Ga. 1979); *Bailey v. Boilermakers Local 667*, 480 F.Supp. 274, 278–79 (N.D.W.Va.1979); *Ludwig v. Quebecor Dailies, Inc.*, 475 F.Supp. 57, 58 (E.D.Pa.1979); *Ferrell v. Assoc. of Central Oklahoma Gov'ts.*, 481 F.Supp. 125, 128 (W.D. Okl.1978); *Saad v. Burns Int'l. Security Servs.*, 456 F.Supp. 33, 37 (D.D.C.1978); *Vogel v. Torrance Bd. of Educ.*, 447 F.Supp. 258, 261 (C.D. Cal.1978); *Apodaca v. Gen. Elec. Co.*, 445 F.Supp. 821, 823 (D.N.M.1978); *Fannie v. Chamberlain Mfg. Co., Derry Div.*, 445 F.Supp. 65, 77 (W.D.Pa.1977); *Krieger v. Republic Van Lines of Southwest, Inc.*, 435 F.Supp. 335, 338 (S.D.Tex.1977); *Balmes v. Bd. of Educ. of Cleveland City School Dist.*, 436 F.Supp. 129, 132 (N.D.Ohio 1977); *Bell v. St. Regis Paper Co., Container Div.*, 425 F.Supp. 1126, 1136 n. 3 (N.D.Ohio 1976); *Melanson v. Rantoul*, 421 F.Supp. 492, 499–50 (D.R.I.1976); *Holton v. Crozer-Chester Medical Ctr.*, 419 F.Supp. 334, 336 (E.D.Pa.1976); *Wisconsin Nat'l Org. for Women v. Wisconsin*, 417 F.Supp. 978, 981–82 (W.D.Wis.1976); *Harbert v. Rapp*, 415 F.Supp. 83, 85–86 (W.D.Okl.1976); *Beamon v. W. B. Saunders Co.*, 413 F.Supp. 1167, 1173 (E.D.Pa. 1976); *Milner v. Nat'l School of Health Tech.*, 409 F.Supp. 1389, 1395 (E.D.Pa.1976); *Clark v. Morgan's Austintown Foods, Inc.*, 405 F.Supp. 1008, 1009 (N.D.Ohio 1976); *Raether v. Phillips*, 401 F.Supp. 1393, 1396 (W.D.Va.1975); *Thomas v. Firestone Tire and Rubber Co.*, 392 F.Supp. 373, 374–75 (N.D.Tex.1975); *Jackson v. Univ. of Pittsburgh*, 405 F.Supp. 607, 610–11 (W.D.Pa.1975); *Knott v. Missouri Pacific R.R.*, 389 F.Supp. 856, 857 (E.D.Mo.1975); *Rackin v. Univ. of Pennsylvania*, 386 F.Supp. 992, 1008 (E.D.Pa.1974); *Held v. Missouri Pacific R.R.*, 373 F.Supp. 996, 998–99 (S.D.Tex.1974); *League of Academic Women v. Regents of Univ. of California*, 343 F.Supp. 636, 640 (N.D. Cal.1972); *Fitzgerald v. United Methodist Community Ctr.*, 335 F.Supp. 965, 966 (D.Neb. 1972).

7. *Accord, e. g., Des Vergnes v. Seekonk Water Dist.*, 601 F.2d 9, 13 (1st Cir. 1979); *Manzanares v. Safeway Stores*, 593 F.2d 968, 971 (10th Cir. 1979); *Patterson v. Am. Tobacco Co.*, 535 F.2d 257, 270 (4th Cir.), *cert. denied*, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976); *Brady v. Bristol-Meyers, Inc.*, 459 F.2d 621, 623 (8th Cir. 1972); *Agnew v. City of Compton*, 239 F.2d 226, 230 (9th Cir.), cert. denied, 353 U.S. 959, 77 S.Ct. 868, 1 L.Ed.2d 910 (1957).

In the face of seemingly unambiguous statutory language, emphatic contemporaneous statements by legislators and an unbroken tide of case law rejecting Bobo's arguments, we conclude that the district court properly held that sex discrimination is not cognizable under § 1981.[8]

*Bobo's Other Claims*

In her pro se brief, Bobo generally asserts error in the district court's findings of fact. As outlined above, the court found neither disparate racial impact nor discriminatory purpose in ITT's actions. The court further found that ITT terminated Bobo because of her repeated failure to abide by company rules. With ample support in the record, these findings readily pass muster as not clearly erroneous. *Grigsby v. North Mississippi Medical Center, Inc.*, 586 F.2d 457, 461 (5th Cir. 1978); Fed.R.Civ.P. 52(a).

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

8. Since we reject Bobo's argument, we do not consider her further contention that the 13th amendment authorizes § 1981's application to private sex discrimination.