**Jeetendra BHANDARI
Plaintiff-Appellant,**

**v.**

**FIRST NATIONAL BANK OF COMMERCE Defendant-Appellee.**

**No. 85–3445.**

United States Court of Appeals,
Fifth Circuit.

Jan. 29, 1987.
Rehearing Granted March 2, 1987.

Mark G. Murov, Rita K. Ward, Murov & Ward, New Orleans, La., for plaintiff-appellant.

James B. Irwin, Marta Alison Richards, Montgomery, Barnett, Brown & Read, New Orleans, La., for defendant-appellee.

Before GEE and HILL, Circuit Judges, and HUNTER,* District Judge.

* District Judge of the Western District of Louisiana, sitting by designation.

GEE, Circuit Judge:

Appellant Jeetendra Bhandari sued appellee First National Bank of Commerce after First National declined to issue him a credit card. First National refused Bhandari credit in part because he was not a citizen of the United States. The district court held that neither 42 U.S.C. § 1981 nor the Equal Credit Opportunity Act ("ECOA") gave Bhandari a legal remedy for private alienage discrimination. The court determined, however, that First National had violated the ECOA by not telling Bhandari all its reasons for denying him credit. The court awarded damages, costs, and attorneys' fees. Bhandari appeals, contending that the district court erred in various respects. We hold that the law of this Circuit recognizes actions for private alienage discrimination under § 1981, but that alienage discrimination is not actionable under the ECOA. Accordingly, we affirm in part, reverse in part, and remand.

I

Bhandari is a citizen of India and a lawful permanent resident of the United States. In October 1983, Bhandari was employed as an accountant. He applied to First Bankcard Center, an instrumentality of First National, for unsecured revolving consumer credit in the form of a Visa or Master Card credit card. The application included the question "Are you a U.S. citizen?" Bhandari answered "No."

The application was reviewed by a credit analyst. First National used a "judgmental" credit evaluation system. It established certain guidelines and allowed its credit analysts to use their judgment in applying those guidelines to the facts presented by each application. At the time

Bhandari's application was processed, one of First National's credit policy "guidelines" was: "Applicant must be a U.S. citizen unless application is approved by an officer of the Bank." The district court found that the analyst who reviewed Bhandari's application denied it for two reasons: his alienage and his short time of employment in his then-current job. First National sent Bhandari a letter stating only that he was denied credit because he was not a U.S. citizen.

Bhandari wrote First National to inquire about the Bank's policies. A credit clerk called Bhandari in response to his letter. Bhandari asked the clerk if it was First National's policy to deny credit cards to non-citizens. In an ill-considered attempt to fob off Bhandari with an authoritative answer, the clerk briefly put him on hold, then falsely stated that she had checked with her supervisor, who had confirmed that First National did not issue credit cards to non-citizens.

Bhandari retained an attorney. In February 1984, his attorney discussed the denial of his application with John Richardson, support services manager of First Bankcard Center. Richardson apparently was disturbed to learn that one of his credit analysts had used an applicant's non-citizenship as the sole reason for denial of credit. He felt that the "guideline" was only one factor, and that the factor had been given greater weight than it deserved.[1] Richardson told Bhandari's attorney that if Bhandari's lack of U.S. citizenship was the only reason he had been denied a credit card, First National would correct the situation by issuing a card with an apology. When Bhandari's attorney said his client would also have to recover attorneys' fees, Richardson said he would

---

1. Richardson was the author of the disputed "guideline." In his deposition testimony, he attributed a completely idiosyncratic meaning to it. Richardson testified that by "Applicant must be a U.S. citizen unless application is approved by an officer of the Bank," he meant to convey to credit analysts that they had the authority to approve credit for aliens, but that they were required to receive the approval of a bank officer for *denying* credit on the basis of non-citi-

zenship! This explains Richardson's apparently genuine (if entirely unreasonable) surprise that an alien had been denied credit on the basis of the "guideline."

Richardson subsequently changed the "guideline" to read: "Applicant must be a U.S. citizen or demonstrate status of legal permanent resident, or application must be approved by an officer of the Bank."

have to discuss the matter with the Bank's attorneys.

Bhandari's attorney then wrote to counsel for First National offering to settle the case. The letter stated that Bhandari "has obtained Visa and Master Card credit elsewhere and is not interested in opening a new account with First Bankcard Center. In general, his primary concern is that the policy be changed for future applicants, and that some publicity be given to this result." The letter stated that Bhandari would settle if First National (1) changed its policies and practices of treating legal resident aliens differently from citizens, (2) changed its application forms to reflect this change in policy, (3) requested in writing immigration status information from all non-citizen applicants who later turned in the old application forms still in circulation, (4) "explicitly authorized" Bhandari and his attorney to represent to various United States organizations and newspapers related to immigration and Indian affairs that First National's policy was changed due to their efforts, and (5) paid Bhandari $1500 in attorneys' fees for his legal costs to that point. First National rejected this offer.

Bhandari filed suit alleging that First National's denial of credit was discrimination against him on the basis of his alienage and his national origin, in violation of both the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691–91f, and 42 U.S.C. § 1981. After discovery, he amended his complaint to add the allegation that First National had failed to inform him fully of the reasons for the adverse action on his credit application in violation of a provision of the ECOA, 15 U.S.C. § 1691(d).[2] Bhandari requested actual and punitive damages and declaratory and injunctive relief for all his claims. He also sought attorneys' fees under 15 U.S.C. § 1691e(d) and 42 U.S.C. § 1988. The parties submitted the case to the district court on stipulations, deposi-

tions, memoranda, and exhibits; no live testimony was offered.

The district court held that Bhandari's claims for injunctive and declaratory relief were moot because First National had voluntarily changed its policy and Bhandari had offered no evidence that First National was persisting in the challenged practices. The court found no factual basis for Bhandari's claim that he was discriminated against on the basis of his national origin in violation of the ECOA, 15 U.S.C. § 1691(a).[3] The court found that First National discriminated against Bhandari on the basis of his alienage. The court held, however, that neither the ECOA or § 1981 provide a cause of action to redress private alienage discrimination. The district court noted that *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641 (5th Cir.1974), was directly contrary to its conclusion that § 1981 does not reach private alienage discrimination, but held that *Guerra* was no longer good law.

The district court determined that First National violated the notice provisions of the ECOA, 15 U.S.C. § 1691(d), which require the lender to furnish to the applicant a complete list of specific reasons for "adverse action." The court noted that "In their zeal to avoid the appearance of any discriminatory acts or practices, those [First National's] witnesses established additional reasons other than plaintiff's citizenship for denial of credit." Memorandum opinion ("Op.") at 10. The court awarded Bhandari attorneys' fees of $1500 under 15 U.S.C. § 1691e(d). Finally, the court "taxed" the total costs of the depositions used in lieu of live testimony equally to both parties, and ordered the defendant to pay all other costs.

## II

In *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641 (5th Cir.1974), a panel of this court held that § 1981 prohibits

---

2. Bhandari alleged in his amended complaint that he was discriminated against on the basis of his race or color in violation of § 1981, but abandoned this theory before trial.

3. The district court also held that § 1981 does not prohibit discrimination based on national origin. Bhandari does not appeal this determination.

private discrimination based on alienage. The plaintiff in that case was a Mexican national who was demoted under a policy of his employer and his union that gave certain preferred jobs to United States citizens. The court began by noting that § 1981 was derived in part from the § 1 of the Civil Rights Act of 1866, which was addressed only to racial discrimination. 498 F.2d at 653 (citing *Jones v. Alfred Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968)). The court pointed out, however, that in § 16 of the Voting Rights Act of 1870 the language of § 1 of the 1866 Act was modified to give aliens the *same* list of rights (except real property rights now found in § 1982) as those enumerated in § 1 of the 1866 Act. The court noted that § 1981 had been interpreted to prohibit private racial discrimination, citing *Sanders v. Dobbs Houses, Inc.*, 431 F.2d 1097 (5th Cir.1970), *cert. denied*, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 321 (1971).[4] From these premises, the court drew the logical conclusion that the language of § 16 of the 1870 Act, now found almost verbatim in § 1981, should reach private alienage discrimination as well.

Only two published decisions have since carefully considered the problem posed and answered in *Guerra*. In *Espinoza v. Hillwood Square Mutual Ass'n*, 522 F.Supp. 559 (E.D.Va.1981), the court followed the syllogism of *Guerra*. Section 16 of the 1870 Act was intended to protect aliens from alienage discrimination to the same extent that § 1 of the 1866 Act protected citizens from racial discrimination. Section 1 prohibits private racial discrimination. Therefore, § 16 prohibits private alienage discrimination. 522 F.Supp. at 564.

*De Malherbe v. Int'l Union of Elevator Constructors*, 438 F.Supp. 1121 (N.D.Cal. 1977), reached the opposite conclusion. The court adopted a different argument.

Section 1 of the 1866 Act may reach private discrimination. The authors of § 16 of the 1870 Act, however, did not realize that. The legislative history of § 16 shows beyond a doubt that the sponsors of the legislation meant only to prohibit alienage discrimination under color of state law. The fact that § 1 and § 16 were merged in § 1981 cannot magically infuse § 16 with a purpose that never entered the minds of those in Congress who sponsored it and voted for it. Therefore, § 1981 does not reach private alienage discrimination. 438 F.Supp. at 1140.

Both arguments are entirely plausible. We must consider the history of § 1981 and the Supreme Court's authoritative interpretations of it to determine which is correct.

## A

Title 42 U.S.C. § 1981 is a simple statute that has been interpreted in extraordinarily complex ways. The statute reads:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, to be parties, give evidence, and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

On its face, the statute simply gives to all persons the right to be treated equally under the law, or, more accurately, the right to be treated as well as "white citizens." For better or worse, however, the statute has not received such a simple reading.

Although long viewed as reaching state action only,[5] the statute more recently has

---

4. The holding of *Sanders* was subsequently approved in *Johnson v. Railway Express Agency*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). *Johnson* held that the statute of limitations for actions under § 1981 was not tolled by proceedings before the Equal Employment Opportunity Commission under the Civil Rights Act of 1964; *Johnson* tacitly over-

ruled part of *Guerra* that had ruled to the contrary. *See Williams v. Phil Rich Fan Mfg.*, 552 F.2d 596, 597 (5th Cir.1977).

5. *See, e.g., Hurd v. Hodge*, 334 U.S. 24, 31, 68 S.Ct. 847, 851, 92 L.Ed. 1187 (1948) (judicial enforcement of restrictive covenants prohibited by § 1982; the statute is directed toward gov-

been interpreted to prohibit private racial[6] discrimination in various forms of contracting,[7] despite the fact that only one phrase and perhaps only one word in the entire statute ("*make* and enforce contracts") can even arguably be read to reach beyond notions of legal capacity and equal treatment under law. Some courts have concluded that *only* this phrase in the entire statute reaches private conduct,[8] while others have interpreted the statute more ex-

pansively to allow actions for private violations of other clauses.[9] At least in the context of private acts, § 1981 has been read to prohibit only intentional discrimination.[10]

Several Supreme Court cases have established that aliens are "persons" within the meaning of the statute,[11] but these cases do not illuminate the basis and scope of § 1981's protections.[12] An astonishing

ernmental action); *Corrigan v. Buckley*, 271 U.S. 323, 330–31, 46 S.Ct. 521, 524, 70 L.Ed. 969 (1926) (restrictive covenants do not involve state action and therefore do not violate the constitution or the Civil Rights Act); *Civil Rights Cases*, 109 U.S. 3, 16, 3 S.Ct. 18, 24, 27 L.Ed. 835 (1883) (1866 Act directed to state action).

**6.** The vast majority of courts that have considered claims of national origin, religion, or sex-based discrimination have rejected them. *See* 2 J. Cook & J. Sobieski, *Civil Rights Actions* ¶ 5.08 (1986) (collecting cases). There is considerable confusion, however, about the proper definition of "race" (and its relation to national origin) for § 1981 purposes. The Supreme Court appears to be ready to address this problem. *See Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 517 (3d Cir.) (ethnic Arab can assert a claim for "racial" discrimination under § 1981), *cert. granted*, —— U.S. ——, 107 S.Ct. 62, 93 L.Ed.2d 21 (1986); *Shaare Tefila Congregation v. Cobb*, 785 F.2d 523, 527 (4th Cir.) (discrimination against Jews not racial discrimination under § 1981), *cert. granted*, —— U.S. ——, 107 S.Ct. 62, 93 L.Ed.2d 21 (1986); *see also Alizadeh v. Safeway Stores*, 802 F.2d 111, 115 (5th Cir.1986) (following *Al-Khazraji*).

**7.** *See, e.g., Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (publicly-offered education at private non-sectarian schools); *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (employment contracts).

**8.** *See Shaare Tefila Congregation v. Cobb*, 785 F.2d at 526; *Mahone v. Waddle*, 564 F.2d 1018, 1029 (3d Cir.1977), *cert. denied sub nom. City of Pittsburgh v. Mahone*, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978).

**9.** *See, e.g., Pennsylvania v. Local 542, I.U.O.E.*, 347 F.Supp. 268, 288 (E.D.Pa.1972) ("to sue, to be parties, give evidence" clause).

**10.** *See General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

**11.** *See Graham v. Richardson*, 403 U.S. 365, 377, 91 S.Ct. 1848, 1855, 29 L.Ed.2d 534 (1971); *Takahashi v. Fish and Game Commission*, 334 U.S.

410, 419–20, 68 S.Ct. 1138, 1142–43, 92 L.Ed. 1478 (1948); *Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886).

**12.** In *Graham v. Richardson*, the Court invalidated state restrictions on the availability of welfare benefits to aliens on the grounds that the restrictions violated the equal protection clause of the fourteenth amendment. The Court also held, in the alternative, that the restrictions were preempted by conflicting federal policy. Section 1981 was cited as evidence of Congress' liberal treatment of aliens under its plenary authority to regulate immigration. 403 U.S. at 377–78, 91 S.Ct. at 1855.

In *Takahashi*, the Supreme Court invalidated a California law denying fishing licenses to persons ineligible for citizenship under federal law. The law was clearly aimed at Japanese residents who were then the only significant alien group in the state ineligible for citizenship. The rationale of the decision is far from clear, but the Court seems to invalidate the law as an unreasonable classification in violation of the equal protection clause of the fourteenth amendment. *See Truax v. Raich*, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915). California tried to justify the reasonableness of the classification on the grounds that it simply mirrored the federal classification that made the Japanese ineligible for citizenship in the first place. The Court rejected the argument's analogy by distinguishing the federal government's broad constitutional powers over immigration, but also tried to undermine the analogy by pointing to § 1981 as evidence of federal policy to the contrary. 334 U.S. at 419–20, 68 S.Ct. at 1142–43.

In *Yick Wo*, the Court reviewed a San Francisco ordinance purporting to regulate the use of wooden buildings for commercial laundry facilities. The regulation permitted exceptions to be made by the city Board of Supervisors. The Supervisors had granted exceptions to 80 white citizens and denied exceptions to 200 Chinese aliens. No white citizen had been denied and no Chinese alien granted an exception. The Court noted that the fourteenth amendment applies to aliens and held that the regulation was unconstitutional under the equal protection clause. Section 1977 of the Revised Statutes

number of cases opine in dicta that § 1981 prohibits alienage discrimination, usually in contexts in which no state action is present;[13] actual holdings on the subject are rare, however. As we have noted, a few courts have held that the statute pro-

hibits private alienage discrimination,[14] while others have concluded that the statute prohibits only private discrimination on the basis of race, while prohibiting alienage-based discrimination involving state action.[15] One court has recently accepted[16]

(now § 1981) was recited as a statutory implementation of the fourteenth amendment. 118 U.S. at 369, 6 S.Ct. at 1070, 30 L.Ed. at 226.

These cases make clear that § 1981 somehow applies to aliens, but all three cases involve state action invalidated under the equal protection clause and none involves liability directly under § 1981. They do not even hint at the basis and scope of liability under that section. At a minimum, however, the cases must be read to allow aliens a cause of action under § 1981 for *racial* discrimination on the same footing as citizens. *Cf. Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan,* 518 F.Supp. 993 (S.D.Tex. 1981) (substantial likelihood of success on merits of § 1981 claim by Vietnamese aliens for private discrimination; court cites *Guerra* but is ambiguous about whether racial or alienage discrimination is basis of claim).

**13.** Aside from the Fifth Circuit, where such dicta is understandable given *Guerra,* see *St. Louis v. Alverno College,* 744 F.2d 1314, 1317 (7th Cir.1984); *Bell v. City of Milwaukee,* 746 F.2d 1205, 1259 (7th Cir.1984); *Cariddi v. Kansas City Chiefs Football Club,* 568 F.2d 87, 88 (8th Cir.1977); *Davey v. Tomlinson,* 627 F.Supp. 1458, 1462 (E.D.Mich.1986); *Bates v. Carborundum Co.,* 623 F.Supp. 613, 620 (N.D.Ind.1985); *Quinn v. Kent General Hosp., Inc.,* 617 F.Supp. 1226, 1232 (D.Del.1985); *Bell v. Brennan,* 570 F.Supp. 1116, 1118 (E.D.Pa.1983); *Carrillo v. Illinois Bell Telephone Co.,* 538 F.Supp. 793, 795 (N.D.Ill.1982); *Bell v. City of Milwaukee,* 536 F.Supp. 462, 474 (E.D.Wis.1982) *aff'd in part, vacated in part, rev'd in part,* 746 F.2d 1205 (7th Cir.1984); *Aponte v. National Steel Service Ctr.,* 500 F.Supp. 198, 202 (N.D.Ill.1980); *German v. Killeen,* 495 F.Supp. 822, 827 (E.D.Mich.1980); *University of Missouri Nat'l Education Ass'n v. Dalton,* 456 F.Supp. 985, 995 (W.D.Mo.1978); *Garcia v. Rush-Presbyterian-St. Luke's Med. Ctr.,* 80 F.R.D. 254, 263 (N.D.Ill.1978); *LaFore v. Emblem Tape & Label Co.,* 448 F.Supp. 824, 825 (D.Colo.1978); *Ortega v. Merit Ins. Co.,* 433 F.Supp. 135, 138 (N.D.Ill.1977); *Cubas v. Rapid American Corp.,* 420 F.Supp. 663, 665 (E.D.Pa. 1976); *Holton v. Crozer-Chester Medical Center,* 419 F.Supp. 334, 336 (E.D.Pa.1976), *vacated and remanded,* 560 F.2d 575 (3d Cir.1977); *Harbert v. Rapp,* 415 F.Supp. 83, 86 (W.D.Okla.1976); *Jones v. United Gas Importing Corp.,* 68 F.R.D. 1, 13 (E.D.Pa.1975); *Troy v. Shell Oil Co.,* 378 F.Supp. 1042, 1046 (E.D.Mich.1974).

**14.** See *Guerra v. Manchester Terminal Corp.,* 498 F.2d 641 (5th Cir.1974), *aff'g* 350 F.Supp. 529 (S.D.Tex.1972); *Espinoza v. Hillwood Square*

*Mutual Ass'n,* 522 F.Supp. 559 (E.D.Va.1981). Several other cases can be read to support a claim for private alienage discrimination, but do not squarely hold that such a claim is possible. See *Abdulrahim v. Gene B. Glick Co.,* 612 F.Supp. 256, 262 (N.D.Ind.1985) (plaintiff subject to national-origin slurs argued alienage-based discrimination; court rejected factual claim, while seeming to assume that the allegations, if true, would state a claim under § 1981); *Sud v. Import Motors Limited,* 379 F.Supp. 1064, 1072 (W.D.Mich.1974) (§ 1981 prohibits private alienage and national origin discrimination).

**15.** See *Ben-Yakir v. Gaylinn Associates, Inc.,* 535 F.Supp. 543 (S.D.N.Y.1982); *De Malherbe v. Int'l Union of Elevator Constructors,* 438 F.Supp. 1121 (N.D.Cal.1977); *cf. Rios v. Marshall,* 530 F.Supp. 351, 361 & n. 9 (S.D.N.Y.1981) (rejecting "reverse alienage discrimination" claim and misreading *Guerra* as merely extending § 1981's protections against private racial discrimination to aliens).

There are only a few cases that seem to turn on § 1981 claims involving state action and alienage. We assume that the availability of § 1983/equal protection claims in many such circumstances explains the paucity of cases. See *Morrison v. Jones,* 607 F.2d 1269 (9th Cir. 1979) (suit by resident alien under 1981 and 1983 against county officials; reversing dismissal by lower court based on qualified immunity of defendants), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980); *Inada v. Sullivan,* 523 F.2d 485, 489 (7th Cir.1975) (Japanese alien threatened by police officer with deportation for pursuing remedies for an allegedly illegal arrest; held: plaintiff may have an action for interference with rights to use courts and petition government; those rights "guaranteed to Inada by federal statute 42 U.S.C. § 1981"); *Banerjee v. Roberts,* 641 F.Supp. 1093, 1104 (D.Conn.1986) (plaintiff alien survives summary judgment on, among other things, a claim under 1981 against state university hospital for intentional discrimination); *Rodriguez v. Steirheim,* 465 F.Supp. 1191 (S.D.Fla.1979) (action under both § 1981 and § 1983/equal protection based on alienage assumed to lie against state officials), *aff'd mem.,* 609 F.2d 1007 (5th Cir.1980).

**16.** See *Thomas v. Rohner-Gehrig & Co.,* 582 F.Supp. 669, 672–73 (N.D.Ill.1984) (granting white citizens leave to amend complaint to allege "reverse alienage discrimination" under § 1981).

and one rejected [17] claims by white citizens of "reverse" alienage discrimination. In the context of state action, the interaction between the statute and the equal protection clause of the fourteenth amendment has not even been addressed.[18]

One reason for all this confusion is that the Supreme Court has held that § 1981 was derived from both § 1 of the Civil Rights Act of 1866 and § 16 of the Voting Rights Act of 1870. *See Runyon v. McCrary*, 427 U.S. 160, 168 & n. 8, 96 S.Ct. 2586, 2593–94 & n. 8, 49 L.Ed.2d 415 (1976). The 1866 Act by its terms applies only to citizens, but § 16 of the 1870 Act applies to "all persons."

Congress enacted the Civil Rights Act of 1866 soon after the ratification of the thirteenth amendment. "The principal object of the legislation was to eradicate the Black Codes, laws enacted by Southern legislatures imposing a range of civil disabilities on freedmen." *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 386, 102 S.Ct. 3141, 3148, 73 L.Ed.2d 835 (1982). The 1866 Act declared most persons born in the United States to be citizens, and gave all citizens a wide range of enumerated rights to the extent enjoyed by "white citizens." Act of April 9, 1866, ch. 31, § 1, 14 Stat. 27, 27.[19] The Act made certain deprivations of those rights a federal crime, *id.* at § 2,[20] gave to

**17.** *See Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731, 762 (5th Cir.1986).

**18.** Although state classifications involving alienage are subject to strict scrutiny under the fourteenth amendment, *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), the Supreme Court has established that states may constitutionally restrict certain classes of state employment to citizens. *See, e.g., Cabell v. Chavez-Salido*, 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982) (county probation officers); *Ambach v. Norwick*, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979) (school teachers); *Foley v. Connelie*, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (state troopers). Section 1981 makes alienage discrimination by the states illegal, and there is no hint in the statute of any exceptions along the lines of the exceptions to strict scrutiny developed by the Supreme Court. *Cf. Chavez-Salido v. Cabell*, 427 F.Supp. 158, 162 (C.D. Cal.1977) (three judge court) (holding that aliens have § 1983/equal protection claim but noting § 1981 alienage discrimination claim and citing, inter alia, *Guerra* for proposition that "§ 1981 applies to discrimination in employment based on alienage as well as to employment discrimination which is racially based"), *vacated sub nom. County of Los Angeles v. Chavez-Salido*, 436 U.S. 901, 98 S.Ct. 2228, 56 L.Ed.2d 398 (1978), *on remand, Chavez-Salido v. Cabell*, 490 F.Supp. 984 (C.D.Cal.1980) (three judge court) (affirming prior judgment), *rev'd on other grounds*, 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982); *Dougall v. Sugarman*, 339 F.Supp. 906, 911 (S.D.N.Y.1971) (three judge court) (Lumbard, J., concurring) (challenged statute not only violates equal protection but also violates § 1981), *aff'd on other grounds*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973). To the authors of § 1981, of course, the apparent conflict between the unequivocal words of the statute and the equivocal judicially-created equal protection doctrine would not have existed. The statute was passed during the conceptual heyday of the rights-privileges distinction. It would have stunned members of Congress in 1870 to learn that § 16 of the 1870 Act might give aliens a right to be employed by a state in any capacity. State employment is clearly a privilege. It can be denied altogether, and thus permitted on any grounds; the greater power includes the lesser. But the rights-privileges distinction has been rejected by modern legal minds. *See, e.g., Graham v. Richardson*, 403 U.S. at 374, 91 S.Ct. at 1853. Thus, we must state that we express no opinion about this apparent conflict between § 1981 and equal protection doctrine.

**19.** Section 1 of the act reads:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary not withstanding.

Act of Apr. 9, 1866, ch. 31, 14 Stat. 27, 27.

**20.** Section 2 of the act reads:

federal district courts original jurisdiction of civil and criminal actions related to the Act, *id.* at § 3, provided elaborate instructions on the rights and duties of federal officers in the enforcement of the Act, *id.* at §§ 4, 5, and 7, made interference with enforcement a crime, *id.* at § 6, gave the President special powers to enforce the Act, including the use of the military, *id.* at §§ 8 and 9, and gave a right of appeal to the Supreme Court in "causes under the provisions of this act . . .," *id.* at § 10.

The Voting Rights Act of 1870 focused on establishing the voting rights of all citizens. Congress, however, tacked on three unrelated sections. Section 16 gave "all persons" in the United States the same list of rights given only to citizens in § 1 of the 1866 Act, except those rights related to the ownership and conveyance of property. Act of May 31, 1870, ch. 114, 16 Stat. 140, 144.[21] It also forbade discriminatory taxes on immigrants. *Id.* Section 17 made violations of § 16 a crime,[22] and § 18 re-enacted the 1866 Act and made §§ 16 and 17 enforceable according to the provisions of the earlier act. *Id.* [23]

The 1870 Act was intended to extend many of the protections of the 1866 Act to aliens. This is clear from the language, structure, and history of the statute. First, the change from "citizens" in § 1 of 1866 Act to "all persons" in § 16 of the 1870 Act shows that aliens are protected by the later statute. Also, § 16 mirrors § 1 but adds an entirely new sentence: it prohibits discriminatory state taxes against immigrants from foreign countries.[24] Section 17 tracks the language of § 2 of the 1866 Act making deprivations of secured rights a crime, except that it adds the phrase "on account of such person being an alien" to the earlier phrase "by reason of his color or race" in defining the reach of

---

Sec. 2. *And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court. Act of Apr. 9, 1866, ch. 31, 14 Stat. 27, 27.

**21.** Sec. 16. *And be it further enacted,* That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary not withstanding. No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country which is not equally imposed and enforced upon every person immigrating to such State from any other foreign country; and any law of any State in conflict with this provision is hereby declared null and void. Act of May 31, 1870, ch. 114, § 16, 16 Stat. 140, 144.

**22.** Sec. 17. *And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court. Act of May 31, 1870, ch. 114, § 17, 16 Stat. 140, 144.

**23.** Sec. 18. *And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April nine, eighteen hundred and sixty-six, is hereby re-enacted; and sections sixteen and seventeen hereof shall be enforced according to the provisions of said act. Act of May 31, 1870, ch. 114, § 18, 16 Stat. 140, 144.

**24.** *See supra* note 21.

liability and describing the protected class.[25]

Second, § 16 omits the phrase "to inherit, purchase, lease, sell, hold, and convey real and personal property" found in § 1 of the 1866 Act. Before and after the 1870 Act, the states imposed significant restrictions on the ownership or control of real property by aliens. *See Takahashi v. Fish and Game Commission*, 334 U.S. 410, 422, 68 S.Ct. 1138, 1144, 92 L.Ed. 1478 (1948) (citing cases sustaining restrictions); *Truax v. Raich*, 239 U.S. 33, 40, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915) (same). Thus, the omission of certain rights found in § 1 of the 1866 Act shows that § 16 was designed to protect aliens.[26] It also shows that the 1870 Act was designed to prohibit certain *alienage-based* discriminations, and not simply to make aliens eligible to assert racial discrimination claims.

Finally, the legislative history is clear. Sections 16, 17, and 18 of the 1870 Act first appeared on January 10, 1870, as S.365, "a bill to secure to all persons the equal protection of the laws...." Cong.Globe, 41st Cong., 2d Sess. 323 (1870). Senator Stewart of Nevada, the bill's sponsor, later described the relationship between S.365 and the 1866 Act:

> The original civil rights bill protected all persons born in the United States in the equal protection of the laws. This bill extends it to aliens.... It extends the operation of the civil rights bill ... to all persons within the jurisdiction of the United States.

Cong.Globe at 1536. Again, the point of the bill was not merely to bring aliens into the class of persons who could assert racial discrimination claims; it was meant to protect aliens of any race from alienage discrimination. Senator Stewart stated that:

> I would be less than man if I did not insist ... that we will protect Chinese aliens *or any other aliens whom we allow to come here*, and give them a hearing in our courts; let them sue and be sued; let them be protected by all the laws and the same laws that other men are.

*Id.* at 3658 (emphasis added).

Thus at the end of 1870, federal law contained two similar provisions. One gave citizens certain rights, the other gave all persons a subset of those rights. The two statutes had distinct purposes and distinct histories. But things did not remain so simple.

Codifiers of the federal statutes were appointed pursuant to the Act of June 27, 1866, ch. 140, 14 Stat. 74, re-enacted by Act of May 4, 1870, ch. 72, 16 Stat. 96, "to revise, simplify, arrange, and consolidate all statutes of the United States...." § 1, 14 Stat. at 74. Congress commanded them to "bring together all statutes and parts of statutes which, from similarity of subject, ought to be brought together, omitting redundant or obsolete enactments, and making such alterations as may be necessary to reconcile the contradictions, supply the omissions, and amend the imperfections of the original text...." § 2, 14 Stat. at 75.

The codifiers confronted the overlapping civil rights statutes. The 1870 Act gave "all persons" certain rights; the 1866 Act protected only citizens but gave a broader range of rights. Section 16 appeared to subsume all but the property-rights aspect of § 1, since the language was closely parallel and the class of persons protected was a superset of the class protected by § 1.

---

**25.** *See supra* notes 20 (§ 2) and 22 (§ 17).

**26.** In a discussion in the Senate of S.365, which later became §§ 16, 17, and 18 of the 1870 Act (discussed below), Senator Pomeroy asked S.365's sponsor Senator Stewart about the exact effect of the bill:

> Mr. POMEROY. I have not examined this bill, and I desire to ask the Senator from Nevada [Senator Stewart] a question. I understood him to say that this bill gave the same civil rights to all persons in the United States which are enjoyed by citizens of the United States. Is that it?
> Mr. STEWART. No; it gives all the protection of laws. If the Senator will examine this bill in connection with the original civil rights bill [the 1866 Act], he will see that it has no reference to inheriting or holding real estate.

Cong.Globe, 41st Cong., 2d Sess. 1536 (1870).

The Revisers' solution was to carve out the property rights given to citizens only, to put these in § 1978 of the Revised Statutes (now § 1982),[27] and to put part of § 16 of the 1870 Act in § 1977 of the Revised Statutes (now § 1981). Thus, § 1982 is a fragment of § 1 of the 1866 Act, while § 1981 is an amalgam of part of § 1 and most of § 16 of the 1870 Act.

## B

These statutes lay dormant for a hundred years, until the Supreme Court called up the fragment of § 1 of the 1866 Act found in § 1982.[28] In *Jones v. Alfred Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), the Court held that § 1982 prohibited private discrimination on the basis of race in the sale of real estate. Recognizing the common origin of § 1982 and § 1981, the courts of appeals quickly extended the reasoning of *Jones* to prohibit private employment discrimination on the basis of race. *See, e.g., Sanders v. Dobbs Houses, Inc.*, 431 F.2d at 1100. The Supreme Court gave its benediction to these cases in *Johnson v. Railway Express Agency*, 421 U.S. 454, 459 n. 6, 95 S.Ct. 1716, 1720 n. 6, 44 L.Ed.2d 295 (1975), but did not independently explore § 1981 and private discrimination until *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). In *Runyon*, the Court held that a privately-owned school was prohibited by § 1981 from denying admission to prospective students on the basis of race. 427 U.S. at 167–68, 96 S.Ct. at 2593. *Jones*, of course, relied on § 1 of the 1866 Act from which § 1982 derived. *Runyon*

extended the holding of *Jones* to § 1981 by concluding that § 1981 derives in part from § 1 of the 1866 Act, but *Runyon* relied entirely on the analysis of *Jones* for the underlying proposition that § 1 reaches private racial discrimination. We must examine *Jones* to see if its reasoning supports *Guerra*'s interpretation § 16 of the 1870 Act.

The Supreme Court advances three arguments in *Jones* to establish that § 1 of the 1866 Act reaches private discrimination. First, the Court argues that:

> In plain and unambiguous terms, § 1982 grants to all citizens, without regard to race or color, "the same right" to purchase and lease property "as is enjoyed by white citizens." As the Court of Appeals in this case evidently recognized, that right can be impaired as effectively by "those who place property on the market" as by the State itself. For, even if the State and its agents lend no support to those who wish to exclude persons from their communities on racial grounds, the fact remains that, whenever property "is placed on the market for whites only, whites have a right denied to Negroes."

392 U.S. at 420–21, 88 S.Ct. at 2193 (footnotes omitted). This argument applies with equal force to § 16 of the 1870 Act which uses identical language.[29]

But, while constrained to respect the argument by its source, the force of it escapes us: no white citizen had in 1866 (or has today) a right to purchase a house from anybody.[30] Indeed, in 1866 he did not

**27.** Section 1982 now reads:
> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982.

**28.** Because the 1866 Act and the 1870 Act were thought to reach only state action, they were overshadowed by the equal protection clause of the fourteenth amendment. The fourteenth amendment was and is the primary instrument of judicial supervision of the states. The 1866 Act, however, was briefly awakened in *Hurd v. Hodge*, 334 U.S. 24, 31, 68 S.Ct. 847, 851, 92

L.Ed. 1187 (1948), a companion case of *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). *Hurd v. Hodge* invalidated the judicial enforcement of restrictive covenants in the District of Columbia, in part on the basis of § 1982. The fourteenth amendment did not apply, of course, and the Court was not yet willing to read a federal equal protection clause into the fifth amendment.

**29.** *See supra* note 21.

**30.** Whites had at the time when § 1981 was first enacted, and have (with a few exceptions mentioned below) no right to make a contract

even have a legally enforceable claim—a "right"—not to have his offer to purchase refused on any idiosyncratic ground whatsoever, including that the seller disliked having business dealings with whites. The first *Jones* argument does not persuade us that the 1870 Act bans private discrimination against aliens.

The Court's second argument is based on the structure of § 1 and § 2. Section 1 grants certain rights. Section 2 reads in part:

[A]ny person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act ... shall be deemed guilty of a misdemeanor ...

14 Stat. at 27. The Supreme Court read the criminal provisions of § 2 as limited in an important way.

Indeed, if § 1 had been intended to grant nothing more than an immunity from *governmental* interference, then much of § 2 would have made no sense at all. For that section, which provided fines and prison terms for certain individuals who deprived others of rights "secured or protected" by § 1, was carefully drafted to exempt private violations of § 1 from the criminal sanctions it imposed. There would, of course, have been no private violations to exempt if the only "right" granted by § 1 had been a right to be free of discrimination by public officials. Hence the structure of

with an unwilling private person, no matter what that person's motivation for refusing to contract. Indeed it is and always has been central to the very concept of a "contract" that there be "assent by the parties who form the contract to the terms thereof," Restatement of Contracts § 19(b) (1932); see also 1 S. Williston, Law of Contracts § 18(3) (3 ed., 1957). The right to make contracts, enjoyed by white citizens, was therefore always a right to enter into binding agreements only with willing second parties. Since the statute only gives Negroes the "same rights" to contract as is enjoyed by whites, the language of the statute confers no right on Negroes to enter into a contract with an unwilling person no matter what that person's motivation for refusing to contract.

the 1866 Act, as well as its language, points to the conclusion urged by the petitioners in this case—that § 1 was meant to prohibit *all* racially motivated deprivations of the rights enumerated in the statute, although only those deprivations perpetrated "under color of law" were to be criminally punishable under § 2.

392 U.S. at 425–26, 88 S.Ct. at 2195–96 (emphasis in original) (footnotes omitted). Again, this argument applies equally to § 16 and § 17 of the 1870 Act; they have precisely the same relationship and their relevant language is almost identical.[31]

There are two problems with this argument. First, § 2 can just as easily be read as "carefully drafted to enforce all of the rights secured by § 1." *Jones*, 392 U.S. at 454, 88 S.Ct. at 2211 (Harlen, J., dissenting).[32] After all, § 1 also contains "color of law" language:

[C]itizens, of every race and color, ... shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, *any law, statute, ordinance, regulation, or custom, to the contrary not withstanding.*

*Runyon*, 427 U.S. at 194, 96 S.Ct. at 2606 (White, J., dissenting).

**31.** *See Espinoza v. Hillwood Square Mutual Ass'n*, 522 F.Supp. at 564 (relying in part on this argument in holding that § 1981 reaches private alienage discrimination).

**32.** The editors of Statutes at Large, contemporaries and subordinates of Congress, read the criminal provisions of the 1866 Act and the 1870 Act this way. Section 2 of the 1866 Act is annotated: "Penalty for depriving any person of any right protected by this act...." 14 Stat. at 27. Section 17 of the 1870 Act is annotated: "Penalty for violation of provisions of preceding section." 16 Stat. at 144.

14 Stat. at 27 (emphasis added). The *Jones* Court simply asserts without argument that the "color of law" clause of § 1 modifies only the immediately preceding "punishments, pains, and penalties" clause, 392 U.S. at 422 n. 29, 88 S.Ct. at 2194 n. 29, but the clause can at least as easily be read as referring to the entire section.

Second, even if § 2 was crafted narrowly to exclude from criminal sanctions private acts depriving persons of § 1 rights, that does not mean that § 1 was designed to reach private discrimination.

> Private interference with a right secured against the states is entirely possible.... Without the qualifying clause in § 17 of the 1870 Act, that section could be interpreted as imposing criminal sanctions on private parties who prevented or hindered aliens from exercising rights which were secured against state interference by § 16.

*De Malherbe,* 438 F.Supp. at 1141. This distinction was meaningful to lawmakers of that era. For example, *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), held that the plain language of part of § 2 of the Civil Rights Act of 1871, now 42 U.S.C. § 1985(3), provided a remedy for deprivations by private conspiracies of equal protection of the laws. The Court noted:

> A century of Fourteenth Amendment adjudication has ... made it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons. Yet there is nothing inherent in the phrase that requires the action working the deprivation to come from the State.

403 U.S. at 97, 91 S.Ct. at 1796. Without the "color of law" phrase, § 2 of the 1866 Act and § 17 of the 1870 Act could have become a font of federal criminal law. Any assault and battery that injured someone sufficiently to prevent him from testifying in a legal proceeding would have

been a federal crime; the attacker had "subjected" the victim to a "deprivation" of the right to "give evidence." Thus, Mr. Wilson of Iowa, Chairman of the House Judiciary Committee, in response to a question about the "color of law" clause in § 2 of the 1866 Act, said that the Committee did not want to make "a general criminal code for the States." Cong.Globe, 39th Cong. 1st Sess., 1120 (1866). The Supreme Court's structural argument based on the "color of law" phrase in the criminal section of the statute is weak; without more, it is not enough to persuade us that § 16 of the 1870 Act was intended to reach private discrimination.

The Supreme Court's last and strongest argument in *Jones* rests on the legislative history of the 1866 Act. It is clear that the Congress was concerned with the devastating effects of private discrimination on newly emancipated blacks.

> The congressional debates are replete with references to private injustices against Negroes—references to white employers who refused to pay their Negro workers, white planters who agreed among themselves not to hire freed slaves without the permission of their former masters, white citizens who assaulted Negroes or who combined to drive them out of their communities.

392 U.S. at 427–28, 88 S.Ct. at 2197 (footnotes omitted). The *Jones* Court assembles an impressive array of evidence in the history of the 1866 Act that Congress meant to root out all the badges and incidents of slavery, including those resulting from purely private animosity. *See* 392 U.S. at 422–37, 88 S.Ct. at 2194–202. Of course, the customary glaring inconsistencies of legislative histories are present in this one, and Justice Harlan in dissent compiles a great deal of persuasive evidence directly to the contrary. *See* 392 U.S. at 454–73, 88 S.Ct. at 2211–20.[33] Neverthe-

---

**33.** It is worth noting that both Justice Powell and Justice Stevens, who concurred in the majority opinion in *Runyon,* agreed with Justice White and Chief Justice Rehnquist in dissent that *Jones* was wrongly decided, and that § 1 of

the 1866 Act was not intended to reach private discrimination. *Runyon,* 427 U.S. at 186, 189, 96 S.Ct. at 2602, 2603. Justices Powell and Stevens disagreed with the dissenters, however,

less, the history of the 1866 Act leaves us with the strong impression that many members of Congress, at least, wanted to eradicate racist practices beyond those the language of the statute appears to reach. If the history of the 1870 Act were similar, *Guerra* could be justified as a perfect analogue of *Jones.*

But the history of the 1870 Act is completely different. It leaves no doubt that Congress was concerned with legal discriminations against aliens by the states alone. The legislative process culminating in § 16 began with a resolution proposed by Senator Stewart and unanimously approved by the Senate on December 6, 1869:

> *Resolved,* That the Committee on the Judiciary be requested to inquire if any States are denying to any class of persons within their jurisdiction the equal protection of the law, in violation of treaty obligations with foreign nations and of *section one of the fourteenth amendment* to the Constitution; and if so, what legislation is necessary to enforce such treaty obligations and such amendment, and to report by bill or otherwise.

that *Jones* could be distinguished and they declined to vote to overrule it.

**34.** S.365 was eventually incorporated into the 1870 Act. *See* remarks of Sen. Trumbell, Cong. Globe at 4307. Its language was almost identical to §§ 16, 17, and 18 of the 1870 Act:

> *Be it enacted, & c.,* That all persons within the jurisdiction of the United States, Indians not taxed excepted, shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary not withstanding. No tax or charge shall be imposed or enforced by any State upon any person emigrating thereto from a foreign country which is not equally imposed and enforced upon every person emigrating to such State from any other foreign country, and any law of any State in conflict with this provision is hereby declared null and void.
>
> Sec. 2. *And be it further enacted,* That any person who, under color of any law, statute,

Cong.Globe, 41st Cong., 2d Sess. 3 (1869) (emphasis added).

On January 10, 1870, Senator Stewart introduced S.365 as the fruition of the December 6 resolution.[34] Cong.Globe at 323. He later described the relationship between the 1866 Act and S. 365:

> The original civil rights bill protected all persons born in the United States in the equal protection of the laws. This bill extends it to aliens, so that all persons who are in the United States shall have equal protection of our laws. It extends the operation of the civil rights bill, which is well known in the Senate and to the country, to all persons within the jurisdiction of the United States. That is all there is in the bill.

Cong.Globe at 1536. On the basis of this passage, both *Guerra,* 498 F.2d at 653, and *Espinoza v. Hillwood Square Mutual Ass'n,* 522 F.Supp. at 564, have concluded that § 16 was intended to reach private discrimination because it "extends the operation" of the 1866 Act to alienage discrimination. This reasoning, however, over-

> ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding $1,000 or imprisonment not exceeding one year, or both, in the discretion of the court.
>
> Sec. 3. *And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April 9, 1866, is hereby reenacted, and said act, except the first and second sections thereof, is hereby referred to and made a part of this act.

Cong.Globe at 1536. There are only three material differences: the "Indian" clause in the first section was dropped; the phrase "white persons" in the second section was changed to "citizens"; and the second part of the third section was changed to make clear that the 1870 Act was to be enforced according to the enforcement provisions of the 1866 Act. (Also, "emigrating" was changed to "immigrating"; *see infra* note 37.)

looks the fact that Senator Stewart and his contemporaries did not view the 1866 Act as reaching private discrimination.[35] The first sentence of the quoted passage—the 1866 Act protects citizens "in the equal protection of the laws"—shows this clearly. The codifiers of federal law thought the same thing in 1874, and gave § 1981 the title that it retains to the present day: "Equal rights under the law." The Supreme Court thought the same thing a decade later. *See Civil Rights Cases,* 109 U.S. 3, 16, 3 S.Ct. 18, 24, 27 L.Ed. 835 (1883). And few thought to the contrary until 1968.

Later, Senator Edmunds introduced S.810, a bill to enforce voting rights under the fifteenth amendment. Cong.Globe at 2808. On May 16, Senator Stewart offered a slightly modified version of S.365 as part of an amendment to S.810. Cong.Globe at 3480. Subsequent debate in the Senate focused on S.810's voting rights provisions and the voting rights provisions of H.R. 1293, the counterpart of S.810 which had already passed the House. Senator Stewart, however, gave a soliloquy on the equal protection provisions on May 20. His remarks show that he, as author and original sponsor, viewed the provisions as an implementation of the fourteenth amendment:

> While [Chinese aliens] are here I say it is our duty to protect them. I have incorporated that provision [S.365] in this bill on the advice of the Judiciary Committee, to facilitate matters and so that we shall have the whole subject before us in one discussion. It is as solemn a duty as can be devolved upon this Congress to see that those people are protected, to see

that they have the equal protection of the laws, notwithstanding that they are aliens. They, or any other aliens, who may come here are entitled to that protection. If the State courts do not give them the equal protection of the law, if public sentiment is so inhuman as to rob them of their ordinary civil rights, I say I would be less than man if I did not insist, and I do here insist that that provision shall go on this bill, and that the pledge of this nation shall be redeemed, that we will protect Chinese aliens or any other aliens whom we allow to come here, and give them a hearing in our courts; let them sue and be sued; let them be protected by all the laws and the same laws that other men are. That is all there is in that provision.

> Why is not this bill a good place in which to put that provision? Why should we not put in this bill a measure to enforce both the fourteenth and fifteenth amendments at once? ... The fourteenth amendment to the Constitution says that no State shall deny to any person the equal protection of the laws. Your treaty says that they shall have the equal protection of the laws. Justice and humanity and common decency require it. I hope that provision will not be left off this bill, for there is no time to take it up as a separate measure, discuss it, and pass it at this session.

Cong.Globe at 3658. The Senate passed H.R.1293 (including the provisions of S.365) the following day. Cong.Globe at 3690.[36] The rest of the legislative history of § 16 in both the House[37] and the Senate[38] is com-

---

**35.** *See supra* note 32.

**36.** H.R. 1293 was passed by a vote of 43–8 under the title "A bill to enforce the right of citizens of the United States to vote in the several States of this Union." Senator Stewart moved to amend the title:

> Mr. STEWART. Add there the words "and for other purposes."
> Mr. SUMNER. Why do you want to have "other purposes" in?
> Mr. STEWART. Here is a provision to enforce the fourteenth amendment. Strike out all after "Union" and insert "and for other purposes."

\*    \*    \*    \*    \*    \*

> Mr. SUMNER. That is the whole case.
> Mr. STEWART. No; the fourteenth amendment, to prevent improper holding of office, and then the civil rights bill have been put on.

The motion passed and the title was amended. Cong.Globe at 3690.

**37.** The equal protection provisions of the Voting Rights Act appeared in the House for the first and only time during the discussion the conference report on H.R. 1293. Representative Bingham, who sponsored H.R. 1293, was a House conferee, and was the floor manager of the bill

---

**38.** See note 38 on page 1097.

pletely consistent with the soliloquy of its author and original sponsor Senator Stewart. *See also Runyon*, 427 U.S. at 195–205, 96 S.Ct. at 2606–2611 (White, J., dissenting) (reviewing the history of § 16 of the 1870 Act as part of his unsuccessful argument that § 1981 was derived *entirely* from the 1870 Act); *De Malherbe*, 438 F.Supp. at 1137–40. Whatever the intentions behind the 1866 Act, it is clear that the 1870 Act was passed as a statutory implementation of the fourteenth amendment, and that state action is therefore required for alienage discrimination to violate § 1981.[39]

Try as we may, we cannot avoid the conclusion that *Guerra* was wrongly decided. To the extent that § 1981 derives from § 16 of the 1870 Act, it should not be interpreted as prohibiting private discrimination. The two arguments in *Jones* that apply to the 1870 Act are unpersuasive, and the persuasive argument does not apply. Because of the curious dual derivation of § 1981, we embrace Justice White's

"logical impossibility" that the same language in the same statute can "mean one thing with respect to one class of 'persons' and another thing with respect to another class of 'persons.'" *Runyon*, 427 U.S. at 206, 96 S.Ct. at 2611 (White, J., dissenting).[40]

## C

*Guerra* was decided over twelve years ago. Subsequent panels of our Court have dealt with *Guerra* inconsistently. Many have reiterated the holding of *Guerra* unequivocally in dicta. *See Jett v. Dallas Indep. School Dist.*, 798 F.2d 748, 762 (5th Cir.1986) ("section 1981 provides a cause of action for public or private discrimination based on race or alienage"); *Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731, 762 (5th Cir.1986) ("[b]oth the Supreme Court and the Fifth Circuit have held that 1981 applies to aliens," citing *Guerra* and *Graham v. Richardson*); *Garner v. Giarrusso*, 571 F.2d 1330, 1340 (5th Cir.1978) ("[§ 1981] protects only

---

that emerged from conference, reviewed the conference report section by section:

> Touching the provision of the Senate amendment limiting the power of the States to impose taxes upon immigrants, I wish to say that the only change made by the conference committee is the change of the word "emigrants" to "immigrants;" and that the only effect of the section is to assert the power of the United States, under the express provision of the national Constitution, over the several States of this Union to this extent and no further, that hereafter the taxes imposed by the several States upon immigrants thereto shall be equal; that the States shall not hereafter discriminate against the immigrant from China and in favor of the immigrant from Prussia, nor against the immigrant from France and in favor of the immigrant from Ireland; that immigrants[,] being persons within the express words of the fourteenth article of the constitutional amendments, shall, whenever they may be found within the jurisdiction of any of the States of the Union, be entitled to the equal protection of the laws, not simply of the State itself, but of the Constitution of the United States as well.

Cong.Globe at 3871.

**38.** There was sharp debate over the voting rights bills leading to the 1870 Act, but little mention of the section that became § 16 and eventually

§ 1981. In one of those few passages, Senator Sherman ruminated about S.810 and S.365:

> These bills seem to have the sanction of the Judiciary Committee. Probably after examination I might approve them; but they are certainly adding an independent subject, making it necessary to change the title of this bill, to change the scope of it, to enlarge greatly the purpose for which the House bill [H.R. 1293] was passed, because *these provide for enforcing the fourteenth amendment* as well as the fifteenth, and provide also for dragging into the controversy the Chinese question and questions of that kind. I am not sure but that after discussion I would agree with the Committee on the Judiciary, that we must *protect the Chinese against the local laws of California;* but it seems to me we ought to do it with our eyes open, and understand what we are doing.

Cong.Globe at 3570 (emphasis added).

**39.** We express no opinion on the scope of § 1981 in the state-action context. *See supra* note 18.

**40.** *But cf. Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) ("prevailing party" in civil rights statutes awarding attorneys' fees to "prevailing party" means one thing as to party plaintiff, another as to party defendant).

against discrimination on the basis of race or alienage," citing *Guerra* ); *Watkins v. United Steel Workers of America, Local No. 2369*, 516 F.2d 41, 49 (5th Cir.1975) ("In *Guerra*, we held that § 1981 prohibits discrimination against aliens even though Title VII does not prohibit such discrimination...."). Other opinions incorporate bald statements that seem inconsistent with *Guerra* without mentioning it. *See Olivares v. Martin*, 555 F.2d 1192, 1196 (5th Cir.1977) ("race must be a factor in discrimination under § 1981"); *McLellan v. Mississippi Power and Light Co.*, 526 F.2d 870, 876 n. 9 (5th Cir.1976) ("Sections 1981 and 1982 make specific reference to race and therefore have not been extended to nonracial discrimination...."), *vacated in part on other grounds*, 545 F.2d 919 (5th Cir.1977) (en banc).

We can find only one case in this Circuit that has followed *Guerra* in its analysis, although its holding can be justified on other grounds. In *Ramirez v. Sloss*, 615 F.2d 163 (5th Cir.1980), plaintiffs were denied employment by a municipality because of alienage. They challenged the discriminatory policy on both equal protection and § 1981 grounds. The policy probably was unconstitutional under the "strict scrutiny" of *Graham v. Richardson* and its progeny. The court, however, analyzed the problem and held for the plaintiffs entirely on § 1981 grounds, citing *Guerra* with approval. The court made no mention of "state action" or of any other distinguishing ground.

But *Guerra* has been questioned. One line of cases in this Circuit, noting the emphasis on *racial* discrimination by the Supreme Court in all its § 1981 and § 1982 decisions, has viewed *Guerra* skeptically on that basis. These cases have sought to

blunt the full impact of *Guerra* by creatively "reinterpreting" it as turning in part on racial discrimination. In *Campbell v. Gadsden County Dist. School Bd.*, 534 F.2d 650 (5th Cir.1976), for example, a panel of our Court upheld a claim by a black under § 1981. In a footnote, the court pointed out that cases upholding actions for private discrimination under § 1981 always involved *racial* discrimination. The court quoted the Supreme Court's statement about § 1982, which it characterized as "the companion statute to section 1981," that " 'the statute in this case deals only with racial discrimination and does not address itself to discrimination on grounds of religion or national origin.' " 534 F.2d at 654 n. 8 (quoting *Jones*, 392 U.S. at 413, 88 S.Ct. at 2189). The court stated:

> Our court has construed section 1981 broadly enough to embrace claims regarding employment discrimination on the basis of alienage. *Guerra*. It should be noted, however, that the discrimination against Mexicans involved there has strong racial overtones.

534 F.2d at 654 n. 8 (citation omitted).

*Campbell*'s reading of *Guerra* has proved to be a popular rebuttal whenever *Guerra* is cited by plaintiffs as authority for a broad reading of § 1981. In *Bobo v. ITT, Continental Baking Co.*, 662 F.2d 340 (5th Cir.1981), *cert. denied*, 456 U.S. 933, 102 S.Ct. 1985, 72 L.Ed.2d 451 (1982), the plaintiff argued that § 1981 prohibits private sex discrimination. A panel of this court correctly rejected this contention.[41] Reflecting on the strong racial emphasis of *Runyon* and *McDonald v. Santa Fe Trail Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (whites have action under § 1981 for racial discrimination), the court stated:

**41.** The court notes that the phrase "white citizens" was inserted in § 1 of the 1866 Act in order to *maintain* legal disabilities of women and minors. The prior language was thought to invalidate such state laws. 662 F.2d at 343. One clever group of plaintiffs has made the theoretically interesting, if completely impractical, argument that § 1981 is unconstitutional on that basis. The idea seems to be that it was an unconstitutional invidious classification for

Congress to provide a remedy for private discrimination based on race while omitting a remedy for other groups (now) protected by the fourteenth amendment. The argument was, of course, rejected, but it illuminates the almost surrealistic quality of the interaction of these 100-year-old statutes with modern judicial praxis. *See League of Academic Women v. Regents of Univ. of California*, 343 F.Supp. 636, 639 (N.D.Cal.1972).

we have previously characterized *Guerra* as a broad construction of § 1981 in a case with "strong racial overtones." *Campbell v. Gadsden County Dist. School Bd.* Whatever vitality it may retain, *Guerra* did not propose extending § 1981 to sex discrimination, and thus lends no support to Bobo's contentions. 662 F.2d at 344 (citation omitted). *See also Daigle v. Gulf State Utilities Co., Local No. 2286,* 794 F.2d 974, 980 (5th Cir.1986) (rejecting a claim that § 1981 protects "scabs" from discrimination; *Guerra* was "a case with 'strong racial overtones' ").[42]

Despite our Court's reservations regarding *Guerra,* nothing in Supreme Court doctrine or our decisions en banc has clearly undermined its holding. There have been only three hints that the Supreme Court might reject *Guerra*'s analogy between the 1866 Act and the 1870 Act. First, the Supreme Court has explicitly noted that the question is still open. *See Espinoza v. Farah Manufacturing Co.,* 414 U.S. 86, 96 n. 9, 94 S.Ct. 334, 340 n. 9, 38 L.Ed.2d 287 (1973). Second, the Court has seemed willing, at least for the sake of argument, to acknowledge that § 1981 may, to the extent that it is derived from the 1870 Act, have a different reach. *See Runyon,* 427 U.S. at 168 n. 8, 96 S.Ct. at 2593–94 n. 8. Third, the Court has indicated a willingness to view the 1870 Act as closely tied to the fourteenth amendment, which would remove it from the realm of private action. *See General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 389, 102 S.Ct. 3141, 3149, 73 L.Ed.2d 835 (1982) (discussing the derivation of § 1981: "The 1870 Act, which contained the language that now appears in § 1981, was enacted as a means of enforcing the recently ratified Fourteenth Amendment."). These hints

are no more than that; they do not seriously call *Guerra* into question.

## D

The district court in the case before us noted that *Guerra* had not been overruled. Nevertheless, the court "decline[d] to follow" *Guerra* because *Bobo* and *Campbell* "place into question both the applicability of the [Civil Rights] Act to instances of private alienage discrimination and its applicability to discrimination other than racial discrimination."

We have reviewed the legislative history of the 1866 and 1870 Acts that form the basis of § 1981, and we have considered the Supreme Court's authoritative exposition of the statute and its predecessors. Although it is perfectly legitimate to assume with *Guerra* that § 16 of the 1870 Act was intended to extend to aliens the very same kinds of protections as § 1 of the 1866 Act extended to racial groups, that assumption does not fit the language of the statute and its legislative history. *Guerra* relied too heavily on a perfect parallel between the 1866 Act and the 1870 Act. The Supreme Court's prohibition of private racial discrimination is justifiable on the basis of the unique history of the 1866 Act. Nothing in the history of the 1870 Act, however, supports an extension of the dubious analysis of *Jones* and *Runyon* to the later statute; and we are convinced that *Guerra* was wrongly decided.

But that does not end the inquiry. It is firmly established policy of our court that one panel does not overrule another "in the absence of intervening and overriding Supreme Court decisions." *White v. Estelle,* 720 F.2d 415, 417 (5th Cir.1983). Nor can a district court do so.[43] Intervening Su-

---

**42.** These cases fictionalize the holding of *Guerra* somewhat in the worthy cause of maintaining a narrow remedial scope for § 1981. It does not appear to us that "racial" discrimination was a factor in *Guerra.* The court noted that the union which formulated the challenged policy was "composed predominantly of Mexican-Americans and Mexican Nationals." *Guerra,* 498 F.2d at 655 n. 36. The plaintiff was Mexican, as was the person who replaced him under the chal-

lenged policy. It may be, moreover, that those panels which have attempted to reinterpret *Guerra* did not fully appreciate the dual origin of § 1981, and the fact that all Supreme Court cases involving § 1981 and § 1982 have turned on the meaning of the 1866 Act alone.

**43.** The district court acknowledged that *Guerra* had not been overruled, but "decline[d] to fol-

preme Court decisions have dealt with the meaning and scope of the 1866 Act, but have not clearly undermined *Guerra* and its interpretation of the 1870 Act. At most, the Supreme Court has intimated that the 1870 Act *might* have a narrower reach than the 1866 Act. Therefore, *Guerra* remains the law of this Circuit, binding us and the trial court.

That court found that First National discriminated against Bhandari on the basis of his alienage. First National has not suggested any reason why its consumer credit activities should be subject to a different analysis under § 1981 than employment contracts or publicly offered education by private schools. Therefore, First National is liable to Bhandari under § 1981 for a violation of his civil rights. We remand the case to the district court to determine whether Bhandari is entitled to additional relief.

### III

Bhandari contends that the district court made a number of errors in adjudging his claims under the liability provisions of the Equal Credit Opportunity Act. First, he suggests that the district court erred in holding that the ECOA does not prohibit discrimination based on citizenship or alienage. Second, he argues that the district court erred in ruling that he was not discriminated against on the basis of his national origin. Third, he claims that the district court should have granted him limited injunctive relief. Finally, he contends that the actual damages awarded him by the district court for First National's violation of the notice provisions of the ECOA were too small, and that the court should have awarded him punitive damages.

### A

■ The ECOA prohibits discrimination against credit applicants "on the basis of

race, color, religion, national origin, sex or marital status...." 15 U.S.C. § 1691(a)(1). The language is closely related to that of Title VII of the Equal Employment Opportunity Act ("EEOA"), 42 U.S.C. § 2000e–2,[44] and was intended to be interpreted similarly. The "race, color, religion, national origin" language was added by amendments to the ECOA in 1976. Pub.L. No. 94–239, 90 Stat. 251 (1976). According to the Senate Report on the amendments:

> The prohibitions against discrimination on the basis of race, color, religion or national origin are unqualified.... In determining the existence of discrimination on these grounds ... courts or agencies are free to look at the effects of a creditor's practices as well as the creditor's motives or conduct in individual transactions. Thus judicial constructions of anti-discrimination legislation in the employment field, in cases such as *Griggs v. Duke Power Company*, 401 U.S. 424[, 91 S.Ct. 849, 28 L.Ed.2d 158] (1971), and *Albemarle Paper Company v. Moody* [, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280] (U.S. Supreme Court, June 25, 1975) are intended to serve as guides in the application of this Act, especially with respect to the allocations of burdens of proof.

S.Rep. No. 589, 94th Cong., 2d Sess. 4–5, *reprinted in* 1976 U.S.Code Cong. & Ad. News 403, 406 (footnote omitted).

Prior to the 1976 amendments, the Supreme Court held that almost identical language in the EEOA does not prohibit discrimination on the basis of alienage. *See Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973). The question is whether this "judicial construction of anti-discrimination legislation in the employment field" applies to the ECOA.[45]

---

low" it without mention or analysis of intervening Supreme Court decisions.

**44.** Title VII makes it unlawful to discriminate in employment on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

**45.** There is almost no judicial authority on this issue, but one case has applied the rule of *Espinoza* to a claim under the ECOA. *See Nguyen v. Montgomery Ward & Co.*, 513 F.Supp. 1039 (N.D.Tex.1981).

The reasoning of *Espinoza* controls this case. Discrimination purely on the basis of alienage does not violate the ECOA. The rationale of *Espinoza* does not suggest any grounds for distinguishing the federal credit anti-discrimination law from federal employment anti-discrimination law when the relevant statutes use almost identical language. Furthermore, we must assume Congress was aware of this important Supreme Court decision handed down several years before the amendments adding the EEOA-like language to the ECOA; the legislative admonition to follow federal employment law makes our decision easy.

## B

■ Bhandari does not seriously dispute our holding that alienage discrimination without more is not forbidden by the ECOA. Instead, he focuses his arguments on establishing that he was discriminated against on the basis of his national origin. National origin discrimination is, of course, illegal under the ECOA. 15 U.S.C. § 1691(a)(1).

Bhandari could have shown national origin discrimination in either of two ways. First, he could have shown that First National actually discriminated against him because of his Indian origin. *See Miller v. American Express Co.*, 688 F.2d 1235, 1239–40 (9th Cir.1982) (marital status discrimination). Or, he could have shown, by analogy to *Griggs v. Duke Power* and its progeny, that First National's facially permissible alienage discrimination had the effect of discriminating against Indians. *See Williams v. First Federal Savings & Loan Ass'n*, 554 F.Supp. 447, 449 (N.D.N.Y.1981) (sex and marital status discrimination), *aff'd mem.*, 697 F.2d 302 (2d Cir.1982); *Cragin v. First Federal Savings & Loan Ass'n*, 498 F.Supp. 379, 384 (D.Nev.1980)

(sex and marital status discrimination); *Cherry v. Amoco Oil Co.*, 490 F.Supp. 1026, 1030 (N.D.Ga.1980) (racial discrimination); S.Rep. No. 589, 94th Cong., 2d Sess. 4–5, *reprinted in* 1976 U.S.Code Cong. & Ad.News 403, 406 (quoted above).

The district court held that Bhandari failed to make either showing. We agree. There is nothing in the record that suggests that Bhandari's application was denied because he is of Indian origin.[46] Furthermore, Bhandari never seriously attempted to make out a prima facie case that First National's policy had an adverse impact on persons of Indian origin, or on persons of any particular origin for that matter. Instead, he continually returns to the argument that discrimination against aliens has the effect of discriminating on the basis of national origin. Of course, it is true that alienage discrimination has the effect of discriminating against persons of origins other than the United States; the vast majority of aliens are foreign-born. But we decline to embrace the *reductio ad absurdum*. This was the position of Justice Douglas in *Espinoza*, but he was in dissent. Bhandari's argument contradicts the holding of *Espinoza* that national origin discrimination is distinct from alienage discrimination.

So it is in one sense not surprising that in the alternative, and "[o]ut of an abundance of caution," Bhandari "respectfully submits" that "*Espinoza* is wrong and certain language therein should be overruled." That argument is not appropriately addressed to us; it should be directed to the Supreme Court, or perhaps Higher—and we do not consider it.

## C

■ Bhandari originally sought to enjoin First National's policy of denying credit to

---

**46.** Bhandari argues that the policy of rejecting applications by aliens was instituted by First National to avoid issuing credit cards to Nigerians. There is evidence in the record that many banks were concerned about several well-publicized incidents of credit card fraud by Nigerian students. A pretextual blanket policy of denying credit to aliens because of the desire to discriminate against persons of a specific national origin might appear to violate the ECOA. The district court found, however, that First National's policy was put in place before the concerns about Nigerians arose. Therefore, we need not discuss whether a person of one national origin could challenge a policy put into place with an illegal purpose to discriminate against persons of a different national origin.

aliens. The district court ruled during pre-trial maneuverings that the policy had been changed, dismissing Bhandari's claims for declaratory and injunctive relief as moot.

Bhandari now argues that the district court erred in dismissing all his claims for equitable relief. He points to one passage in the record where he argued that some of his claims for relief were not mooted by the change in policy. Specifically, he argues that the district court erred in not requiring First National to use credit analysts rather than credit clerks to handle complaints about credit denials: "[W]e believe the Court should tell the Bank that when someone writes back and complains, that certainly a credit analyst (and preferably the particular credit analyst who made the denial) should review that material in order to further the purpose that Congress intended in passing the Equal Opportunity Credit Act."

We see no merit in Bhandari's argument, but we need not reach it. Bhandari has no standing to raise the issue. To meet the standing requirement of Article III of the Constitution, Bhandari must show at a minimum that he has suffered some actual or threatened injury resulting from the allegedly illegal conduct of the defendant *and* that the injury is likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United For Separation of Church and State*, 454 U.S. 464, 472–76, 102 S.Ct. 752, 758–61, 70 L.Ed.2d 700 (1982). Bhandari has alleged an injury, but he would not benefit from the relief sought. He is no longer transacting business with First National. He has not alleged that he intends to reapply to First National for a credit card. Bhandari has no more than an ideological interest in the outcome he seeks; his claim for injunc-tive and declaratory relief is the sort of by-stander's suit forbidden by Article III. *See Valley Forge*, 454 U.S. at 472–73, 102 S.Ct. at 758–59.

**D**

■ The district court awarded Bhandari $1,001.35 in actual damages for First National's violation of the notice provisions of the ECOA. The court found that his only out-of-pocket loss was $1.35 in postage. The court awarded Bhandari an additional $1,000 for the "private, momentary and personal affront" caused by the procedurally flawed denial of credit. Damage awards are findings of fact not subject to reversal unless clearly erroneous. *NCH Corp. v. Broyles*, 749 F.2d 247, 254 (5th Cir.1985). The damages awarded by the district court were not clearly erroneous. On remand, the district court must determine if First National's violation of Bhandari's civil rights under § 1981 caused any additional damages.

■ Bhandari maintains that punitive damages are mandatory upon a finding of liability under the ECOA, and that the district court therefore erred in assessing none against First National. The language of the statute supports Bhandari's argument: "Any creditor ... who fails to comply with any requirement imposed under this subchapter *shall be liable* to the aggrieved applicant for punitive damages in an amount not greater than $10,000 ...." 15 U.S.C. § 1691e(b) (emphasis added). The statute sets our various factors to be considered in establishing the amount of punitive damages, none of which requires that the violation be intentional or reckless. *Id.*[47]

---

**47.** The entire section reads:

Any creditor, other than a government or governmental subdivision or agency, who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $10,000, in addition to any actual damages provided in subsection (a) of this section, except that in case of a class action the total recovery under this subsection shall not exceed the lesser of $500,-000 or 1 per centum of the net worth of the creditor. In determining the amount of such damages in any action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of the failures of compliance by the creditor, the resources of the creditor, the number of persons adversely af-

The courts, however, have not been receptive to a simple reading of the statute. In *Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143 (5th Cir.1983), a panel of this court read the statute to mean that punitive damages may be awarded "if the creditor's conduct is adjudged wanton, malicious or oppressive, or if it is deemed to have acted in reckless disregard of the applicable law." 708 F.2d at 148. *Fischl* relied on *Anderson v. United Finance Co.*, 666 F.2d 1274 (9th Cir.1982) and *Shuman v. Standard Oil Co.*, 453 F.Supp. 1150 (N.D.Cal.1978) for this tight-fisted reading of § 1691e(b). A certain sound still echoes faintly in the hallways of the judicial mind —"statutes in derogation of the common law are to be strictly construed"—but *Fischl*'s reading of the statute is doubtless good policy, and in any event controlling.

There was no showing of wanton or reckless behavior. After the childish misbehavior of the clerk who lied to Bhandari, First National took steps to deal with Bhandari's complaints in a reasonable manner. First National offered Bhandari credit as early as February 1984, changed its the disputed "guideline" in February 1984, and altered its applications to remove the question about citizenship in November 1984. In addition, the actual "violation" may never have occurred. The district court's finding was based on what were intended to be self-serving comments by defendant's employees designed to show that they did not deny Bhandari credit on the basis of his alienage or national origin. On this record and under the authority of *Fischl*, we affirm the district court's denial of punitive damages.

## IV

■ The district court admitted evidence of settlement negotiations between the parties before the case was filed. Bhandari

argues that the evidence was inadmissible under Rule 408, Federal Rules of Evidence. Rule 408 excludes evidence of settlement negotiations if offered to prove or disprove liability. The Rule itself provides, however, that it "does not require exclusion when the evidence is offered for another purpose...." Whether evidence should be admitted for another purpose is within the discretion of the district court; the decision to admit or exclude evidence proferred for other purposes will be reversed only for an abuse of that discretion. *Belton v. Fibreboard Corp.*, 724 F.2d 500, 505 (5th Cir. 1984).

The district court did not abuse its discretion. The disputed evidence was admitted to determine whether Bhandari failed to mitigate damages. This purpose is permissible under Rule 408. *See Urico v. Parnell Oil Co.*, 708 F.2d 852, 854–55 (1st Cir.1983).

## V

### A

■ The district court awarded Bhandari attorneys' fees of $1,500 under the ECOA, 15 U.S.C. § 1691e(d):[48]

The Court is bound by statute to award attorney's fees under the ECOA in light of plaintiff's successful claim. However, the lack of damages to plaintiff's creditworthiness, the Court's perception of plaintiff's failure to minimize costs by prosecuting this case absent such damages; and plaintiff's unilateral choice in bringing about a sizable investment in attorney's time; all compel a minimal award of $1,500 for attorney's fees. In making this award, the Court notes plaintiff has failed to prevail on most of his claims ... The only claim upon which he has prevailed could have been resolved prior to suit, at which time plaintiff's attorney assessed his fees at

fected, and the extent to which the creditor's failure of compliance was intentional.
15 U.S.C. § 1691e(b).

**48.** The section reads:
In the case of any successful action under subsection (a), (b), or (c) of this section, the

costs of the action, together with a reasonable attorney's fee as determined by the court, shall be added to any damages awarded by the court under such subsection.
15 U.S.C. § 1691e(d).

$1,500. The Court therefore concludes this is an appropriate award. Op. at 13. Because we have held that Bhandari's civil rights were violated by First National under *Guerra* 's interpretation of § 1981, we must remand the issue of attorneys' fees to the district court for reconsideration. *See* 42 U.S.C. § 1988.

Even though this issue must be remanded, we think it important to point out that the district court's initial determination of attorneys' fees involved both factual and legal error. The factual error is the district court's apparent belief that Bhandari could have settled before trial for what he eventually received after much time and effort. Bhandari's settlement offers were *rejected* by First National. First National's only offer was the informal one by Richardson to give Bhandari a credit card if he otherwise qualified. As soon as Bhandari's attorney raised the issue of attorneys' fees, Richardson stated that he would have to check with First National's lawyers. There is no other evidence in the record of First National's willingness to settle on any terms that involved any cash payments to Bhandari. Thus, the court erred in concluding that Bhandari's prosecution of this case was a "failure to minimize costs," or otherwise of questionable propriety.

On the basis of its factual mistake, the court set the amount of attorneys' fees at the amount estimated by Bhandari's lawyer as incurred at the time of a settlement offer made before the case was filed. The district court noted that it had not considered the attorneys' fees factors mandated by *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974),[49] "because to do so would result in a negative finding and prevent the mandatory award for plaintiff's successful ECOA action." This shortcut was legal error. Whatever the underlying facts, the court may not avoid making the determination required by *Johnson* and *Hensley v. Eckerhart*, 461 U.S. 424, 432 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983), by arbitrarily awarding a figure discussed in pre-trial negotiations.

We recognize that recent Fifth Circuit law on the status of *Johnson* is in disarray. The Supreme Court decisions in *Hensley* and *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), have weakened the case for strict allegiance to the *Johnson* factors, and the strain is beginning to show.[50] Compare *Nisby v. Commissioners Court of Jefferson County*, 798 F.2d 134, 137 (5th Cir.1986) (reversing attorneys' fee award based on a "lodestar" calculation because "the district court did not evaluate specifically the applicability of each of the *Johnson* factors"; *Hensley* and *Blum* do not alter the rule of *Johnson* ), with *Brantley v. Surles*, 804 F.2d 321, 326 (5th Cir.1986) (upholding award where district court dismissed a number of *Johnson* factors without discussion; "This is sufficient here because we can say the overall fee calculation meets the Supreme Court's guidelines in *Blum* and *Hensley* "). One recent case on this issue includes a spirited dissent, something rare before *Hensley* and *Blum.* *See* *Abrams v. Baylor College of Medicine*,

**49.** Although the Federal Reporter is probably two volumes thicker due to recitations of the *Johnson* factors, we recite them again for the reader's convenience: (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, (12) awards in similar cases. *Johnson*, 488 F.2d at 717–19.

**50.** *Johnson* had been cogently criticized by many judges and scholars well before the questions raised by *Hensley* and *Blum. See, e.g., Copeland v. Marshall,* 641 F.2d 880, 889–90 (D.C. Cir.1980) (en banc); *Ramos v. Lamm,* 539 F.Supp. 730, 735–38 (D.Colo.1982), *vacated and remanded,* 713 F.2d 456 (10th Cir.1983); Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?,* 126 U.Pa.L.Rev. 281, 285–87 (1977).

805 F.2d 528, 537 (5th Cir.1986) (Johnson, J., dissenting). On remand, the district court must make of this muddle what it can. *See Nisby*, 798 F.2d at 137 (Hinojosa, District Judge, concurring) (suggesting clarification by the Court). Under any conceivable standard, however, the court must carefully analyze the time spent, the claimed hourly rate, and the degree of success in the action; it may not rely on figures plucked from settlement negotiations.

### B

 Depositions were submitted in place of live testimony. The district court "taxed" the deposition expenses equally to both parties as "costs," and ordered First National to pay all other costs. Bhandari argues that he was the prevailing party and thus entitled to have First National pay all costs. We agree.

The initial determination of what expenses are costs is for the informed discretion of the district court. *Brumley Estate v. Iowa Beef Processors*, 704 F.2d 1362, 1363 (5th Cir.1983). The expense of depositions reasonably necessary to the case may be awarded as costs. *Allen v. United States Steel Corp.*, 665 F.2d 689, 697 (5th Cir.1982). The "prevailing" party ordinarily recovers costs, but a party need not prevail on all issues to justify an award. *Studiengesellschaft Kohle v. Eastman Kodak*, 713 F.2d 128, 131 (5th Cir.1983).

Bhandari is the prevailing party in this case. He is entitled to costs under 15 U.S.C. § 1691e(d). The district court has no authority to split items of expense once it classifies them as costs. On remand, the district court should award the cost of depositions to Bhandari.

### VI

Today, as we must, we reluctantly reaffirm the holding of *Guerra v. Manchester Terminal Corp.*; aliens can sue under § 1981 for private alienage discrimination. The district court found that First National discriminated against Bhandari because of his alienage. We remand for appropriate relief. We affirm the district court's determination that alienage discrimination is not prohibited by the Equal Credit Opportunity Act, and that Bhandari was not discriminated against because of his national origin. We also affirm the damage awards under the ECOA and reject Bhandari's claim for injunctive relief. We remand the question of attorneys' fees and costs for further proceedings consistent with our opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.